463 P.2d 7

Golden L. ALLEN, State Treasurer, Plaintiff and Appellant,

v.

Calvin L. RAMPTON, Governor of the State of Utah, Sherman J. Preece, State Auditor of Utah, Herbert F. Smart, Director of Finance, W. Smoot Brimhall, Commissioner, Financial Institutions, and the Board of Examiners of the State of Utah, Defendants and Respondents.

No. 11804.

Supreme Court of Utah.

Dec. 31, 1969.

3. 5 Utah 2d 106, 297 P.2d 542 (1956).
4. 21 Utah 2d 189, 442 P.2d 944 (1968).

A. M. Ferro, Sp. Asst. Atty. Gen., Salt Lake City, for appellant.

Raymond W. Gee, Sp. Asst. Atty. Gen., Salt Lake City, for respondents.

ELLETT, Justice.

Appellant, Allen, is the duly elected, qualified, and acting treasurer of the State of Utah. The recent legislature enacted Chapter 206, Laws of Utah 1969, known as the State Money Management Act, which among other things created a division of investments in the office of the state treasurer. It further created an investment council within the division of investments to be composed of the state treasurer, the commissioner of financial institutions, and three other members appointed by the governor by and with the advice and consent of the state treasurer and of the state senate.

The act also provided for the employment of a chief administrative officer and a deputy administrative officer to be known as the financial analyst. These two officers are to be appointed by the state treasurer with the approval of at least four members of the investment council and are to serve at the will of the investment council.

The act empowers the investment council to establish the policies of the division of investments, to direct the investment officer and the financial analyst, to adopt and promulgate rules and regulations pertaining to the investment of public funds, and generally to perform functions relating to the administration of public funds including the determination of the qualifications and control of depositories.

Mr. Allen brought this suit for a declaratory judgment to determine that the act was unconstitutional in that it was an attempt to interfere with his duties as the state treasurer.

The office of state treasurer is created by Article VII, Section 1, of the Constitution of Utah, and the duties are set out in Article VII, Section 17, which reads:

> The Auditor shall be Auditor of Public Accounts, and the Treasurer shall be the custodian of public moneys, and each shall perform such other duties as may be provided by law.

■ What are the duties required by the constitutional provision, and what "other duties" may the legislature require of the state treasurer? Those duties are not specified in the Constitution because there was, at the time the Constitution was drafted and adopted, the office of territorial treasurer whose duties were so well known to the framers of the Constitution

that they may have considered it unnecessary to detail them. The state treasurer would have the duties of his predecessor, to wit, the duties that had theretofore been imposed upon the territorial treasurer, and those duties were assumed by the state treasurer in 1896 with the advent of statehood and have been performed by every state treasurer since that time. Among those duties has been that of the sole custodian of public funds. The state treasurer is liable on his bond for any loss of funds even where he is not at fault.[1]

In speaking of the power of the legislature to add duties to constitutional officers, the Supreme Court of California in Love v. Baehr, 47 Cal. 364 (1874), at pages 367 and 368 said:

> * * * The first question to be determined is whether the Legislature has an unlimited discretion in respect to the nature of the duties which it may require to be performed by these officers? * * * It is admitted that the Constitution contains no express limitation on the power of the Legislature in this particular. But we think a limitation is necessarily implied from the definition of the office. From the earliest period of our history as a nation, almost every State in the Union had a Secretary of State, Controller, Treasurer, and Attorney-General; and the general nature of the

1. Tooele County v. De La Mare, 90 Utah 46, 59 P.2d 1155, 106 A.L.R. 182 (1936).

duties pertaining to each were perfectly well known to the framers of our Constitution. It is clear beyond controversy, that in establishing similar offices here, the framers of that instrument had reference to the same general class of duties, which it was well known pertained to such offices elsewhere. * * *

Many cases have been decided by the courts of the various states which have a bearing upon the problem now before us.

State ex rel. Kennedy v. Brunst, 26 Wis. 412, 7 Am.Rep. 84, 86 (1870), was a case brought by the sheriff of Milwaukee County to have a statute declared unconstitutional. The office of sheriff was created by the Constitution, and the statute in question provided that the House of Corrections of Milwaukee County should be the jail of that county and that the inspector thereof should be ex officio the jailor of the county and have the exclusive charge and custody thereof and of the prisoners. The court in holding the statute unconstitutional said:

* * * Now, it is quite true that the constitution nowhere defines what powers, rights and duties shall attach or belong to the office of sheriff. But there can be no doubt that the framers of the constitution had reference to the office with those generally recognized legal duties and functions belonging to it in this country, and in the territory, when the

constitution was adopted. Among those duties, one of the most characteristic and well acknowledged was the custody of the common jail and of the prisoners therein. * * * And it seems to us unreasonable to hold, under a constitution which carefully provides for the election of sheriffs, fixes the term of the office, etc., that the legislature may detach from the office its duties and functions, and transfer those duties to another officer. In this case it is said that the legislature has attempted to take the largest share of the duties of the sheriff, in point of responsibility and emolument, and to commit it to an officer selected by the county board of supervisors. If the legislature can do this, why may it not deprive the sheriff of *all* the duties and powers appertaining to his office, and transfer them to some officer not chosen by the electors? It would certainly be a very idle provision of the constitution, to secure to the electors the right to choose their sheriffs, and at the same time leave to the legislature the power to detach from the office of sheriff all the duties and functions by law belonging to that office when the constitution was adopted, and commit those duties to some officer not elected by the people. For this would be to secure to the electors the right to choose a sheriff in name merely, while all the duties and substance of the office might

be exercised by and belong to an officer appointed by some other authority. We therefore conclude that it was not competent for the legislature to take from the constitutional office of sheriff a part of the office itself, and transfer it to an officer appointed in a different manner, and holding the office by a different tenure from that which was provided for in the constitution.

The case of State ex rel. Josephs v. Douglas, 33 Nev. 82, 110 P. 177 (1910), involved a statute which made the secretary of state ex officio the clerk of the Supreme Court. In holding the statute invalid, the court at page 180 said:

> Every constitutional officer derives his power and authority from the Constitution, the same as the Legislature does, and the Legislature, in the absence of express constitutional authority, is as powerless to add to a constitutional office duties foreign to that office, as it is to take away duties that naturally belong to it. * * *

> It is well settled by the courts that the Legislature, in the absence of special authorization in the Constitution, is without power to abolish a constitutional office or to change, alter, or modify its constitutional powers and functions. [Citations omitted.]

In 1965 the legislature of New Mexico enacted a statute providing for a transfer from the state auditor to the legislative audit commission all equipment, supplies, records, and all property held by him in his official capacity. It further provided that the state auditor should continue his duties until January 1, 1967, and after that date the salary of the state auditor would be one dollar per year. Even after 1967 the auditor was left with some duties and rights, including serving on the state board of finance and on the board of directors of the employees retirement association, and rights in the line of gubernatorial succession. In the case of Thompson v. Legislative Audit Commission, 79 N.M. 693, 448 P.2d 799 (1968), the court in holding the act unconstitutional said at pages 802 and 803:

> * * * It would seem to us that, both historically and fundamentally, the office of state auditor was created and exists for the basic purpose of having a completely independent representative of the people, accountable to no one else, with the power, duty and authority to examine and pass upon the activities of state officers and agencies who, by law, receive and expend public moneys.

> *   *   *   *   *   *

> The removal of the duties implicit in the office of state auditor requires us to declare unconstitutional the entire statute. * * *

The Arizona legislature passed an act creating the division of purchases and

property control which placed some of the duties of the state auditor under the supervision of the state purchasing agent, an office created by the statute. In holding the act unconstitutional the court in Hudson v. Kelly, 76 Ariz. 255, 263 P.2d 362 (1953), at pages 366 and 369 said:

> With the advent of statehood the auditor became a constitutional officer, with its incumbent being elected by the people and placed under bond. The duties of the officer now are and always have been those of general accountant of the state, and as such has long been termed "the watchdog of the treasury". Such officer has always been independent, responsible only to the law, his bond and the electors at the polls.

> \*   \*   \*   \*   \*   \*

> To make a free and independent constitutional officer subservient to the dictates of some appointive officer is equivalent to abolishing the office and creating another in lieu thereof to exercise the duties and functions belonging to the first office. In was long ago determined that the legislature has no power to take from a constitutional officer the substance of the office itself, and transfer it to another who is to be appointed in a different manner and will hold the office by a different tenure from that which is provided for by the constitution.

> \*. \* \*

The Constitution of Idaho sets up the office of auditor, while under the territorial government the officer was known as the comptroller. In the case of Gilbert v. Moody, 3 Idaho 3, 25 P. 1092, the court held that the office of comptroller had not been abolished by the Constitution—that the name only had been changed to auditor. The Idaho Constitution provided that the executive officers, including the state auditor, should perform such duties as are prescribed by the Constitution and as may be prescribed by law. Thereafter the legislature created the office of controller and gave to the controller broad powers and duties, some of which belonged to the auditor. The constitutionality of this statute was questioned in the case of Wright v. Callahan, 61 Idaho 167, 99 P.2d 961 (Idaho 1940), wherein the court at pages 965 and 966 said:

> If the territorial office was not abolished, and further, if the only change the adoption of Section 1 of Article IV worked was a change of name, then and in that case, it follows the adoption of that section did not change—add any powers and duties to, nor take any from —the office; it simply gave the office a new but synonymous name, and that having been done, lifted it out of the 1887 statute, together with its appurtenant powers and duties, and placed the whole in Section 1, supra.

> \*   \*.   \*   \*   \*   \*

The statute under consideration, in the main, clearly takes from the State Auditor activities which prior to the time of the adoption of the Constitution, were vested in the territorial controller, and since the adoption of the Constitution, have been in the office of State Auditor as a constitutional officer; even though some of such duties have not, by reason of intermittent enactments by the legislature, always been in the State Auditor, they nevertheless belong there. 59 C.J. 116.

\*　　\*　　\*　　\*　　\*　　\*

Having concluded the powers and duties conferred upon the territorial controller as an auditor and "superintendent of the fiscal concerns" and affairs of the territory were, by the adoption of Section 1 of Article IV, supra, impliedly vested in the State Auditor, the legislature could not, therefore, divest him thereof by creating the office of comptroller and vesting in the comptroller the powers and duties which the Constitution already affixed to the auditor's office. [Citations omitted.] Furthermore, to permit the legislature to create an office and vest in the appointee the powers and duties conferred upon a constitutional officer, would be to permit the legislature to nullify the Constitution and reduce it to a mere scrap of paper.

A case similar to the instant matter is that of Tucker v. State, 218 Ind. 614, 35 N. E.2d 270 (1941). The legislature of Indiana enacted a statute which placed the department of treasury in charge of a board consisting of the state treasurer (who was named as the chief administrative officer of the department), the governor, and the lieutenant governor. The Constitution of Indiana, like that of Utah, provides for the three separate and independent branches of government. In holding the statute unconstitutional, the Indiana court quoted from a prior Indiana case, State ex rel. Collett v. Gorby, 122 Ind. 17, 23 N.E. 678, 681 (1890), as follows:

\*　\*　\* "If the construction contended for by the appellee can be sustained, the general assembly may create any number of state offices its discretion may dictate, under any name it may choose, make them appointive, and transfer to them the statutory duties now performed by the secretary, auditor, and treasurer of state; thus rendering the constitutional provision that the administrative state officers shall be elected by the people a dead letter. It would be difficult to find any constitutional provision expressly prohibiting the general assembly from the creation of such offices, making them appointive, and from transferring to them the statutory duties now performed by the administrative state officers above named; and yet such a proceeding would be such a plain violation of the intention of the framers of

the constitution that no court would hesitate to declare that it did not possess such power. To permit such a construction would place it in the power of the legislative department of the state to wholly absorb and usurp the executive and administrative department. It is immaterial whether it is usurped by the direct action of the general assembly, as a legislative body, or whether it is done indirectly, by its own appointed agents. The result in either case is the same. By the express terms of the constitution the general assembly is prohibited from exercising executive or administrative function, except in cases expressly provided for by that instrument."

The court further quoted from the case of State ex rel. Hovey v. Noble, 188 Ind. 350, 21 N.E. 244, 247, 4 L.R.A. 101 (1889), as follows:

"A department without the power to select those to whom it must intrust part of its essential duties cannot be independent. If it must accept as 'ministers and assistants,' as Lord Bacon calls them, persons selected for them by another department, then, it is dependent on the department which makes the selection. To be independent the power of the judiciary must be exclusive, and exclusive it cannot be if the legislature may deprive it of the right to choose those with whom it shall share its labors or its confidences. If one kingdom possesses the right to send into another ministers and assistants, to share with the governing power its functions and duties, the latter kingdom is in no sense independent."

The Constitution of the State of Colorado provided that the state treasurer would keep a separate account of each fund in his hands and report to the governor quarterly, in writing, under oath, the amount of money in his hands, the place where deposited, and so forth, and it made the treasurer and his sureties responsible for any loss occurring to those funds. It further provided that the general assembly might provide by law further regulations for the safe-keeping and management of the public funds. House Bill No. 349 authorized the governor to dictate the particular banks in which public funds should be deposited, and the question of the constitutionality of that bill being raised in the legislature, the Supreme Court of Colorado was asked to give an opinion thereon.

In the case of In re House Resolution Relating to House Bill No. 349, 12 Colo. 395, 21 P. 486 (1889), the Court at page 487 said:

* * * It is hardly possible that the framers of the constitution intended to make the treasurer and his sureties absolutely responsible for the security of the public funds, and yet authorize the legislature to lodge with some other official the control thereof. Such a pur-

pose, besides being illogical, offends the sense of fair dealing and justice animating reasonable and impartial minds. The responsibility and control for safekeeping naturally belong together. Official bonds of this nature are required for the very purpose of protecting the public from loss through the negligence, misconduct, or misfortune of those having the custody of public moneys. The treasurer is the constitutional custodian of these moneys. The legislature cannot devolve this stewardship upon another. That body may command him to disburse such funds as it shall see fit, subject only to constitutional restriction, and it may also direct the investment of the school fund. But for the safe-keeping of the public moneys, till paid out or invested as authorized by statute, he alone is responsible. * * * Moreover, if the legislature may exercise the authority here assumed, we hardly see where any limit can be placed. If it is competent for this body to say that the governor may, directly or indirectly, name the place of deposit for state funds, it is also competent for it to say that he shall appoint the deputy treasurer, bookkeeper, and all other employés required in keeping the accounts and transacting the business of the treasury department. In short, the legislature might absolutely deprive the treasurer of all control, power, or authority over the public funds, and leave him but the poor privilege of being responsible upon his official bond for defalcations or losses in connection therewith. * * *

In regards to the power of the general assembly to provide by law for further regulations for the safekeeping and management of the public funds, the court said at page 488:

 * * * The regulations there mentioned are to be operative only while the funds are "in the hands of the treasurer;" that is to say, until they are disbursed in the liquidation of state indebtedness, in accordance with such statutory provisions as may be adopted or invested in pursuance of authority elsewhere given by the constitution. We are unable to discover in the section of that instrument before us an intention to authorize or permit the legislature, either directly or indirectly, to divest the treasurer of his general control in the premises prior to such disbursement or investment. * * *

This court has on many occasions said that for a statute to be held unconstitutional, it must clearly violate a provision thereof, and that if by any reasonable construction the statute can be made to harmonize with constitutional provisions, it

will be so construed.[2] However, we cannot shirk our duty to say that an act of the legislature is unconstitutional when it clearly appears to us that it conflicts with some provision of the state Constitution.

■ The electorate of this entire state has chosen the plaintiff as its treasurer because of the confidence it had in his ability to perform the duties of his office and in his integrity. The act here questioned attempts to take from him those duties which have belonged to his office since statehood and prior thereto to the territorial treasurer. If he fails to measure up to the requirements of his office, that self-same electorate which elected him to office can remove him; and if he fails to keep safely the public funds entrusted to his care and keeping, then he and his bondsmen will have to respond for any losses sustained. To impose "ministers" upon him whom he can neither hire nor fire and who can choose the depositories for funds entrusted to his care which, if lost, will result in liability to him and his bondsmen is an undue interference with his constitutional rights and duties. Who is there to say that the appellant, the choice of the people of this state, is not qualified to select deputies knowledgeable in financial matters as would be the members of the division of investments? Would it not be better to run the investment officer or the fiscal analyst for the office of state treasurer at the next election if they be better qualified for the job than is the appellant, than to divest the state treasurer of the duties enjoined upon him by the Constitution of this state?

The judgment of the trial court is reversed with directions to enter a judgment holding that Chapter 206, Laws of Utah 1969, insofar as it attempts to set up a Division of Investments or an Investment Council and otherwise interferes with the duties of the state treasurer is unconstitutional and void. Each party will bear its own costs.

CROCKETT, C. J., and CALLISTER, TUCKETT and HENRIOD, JJ., concur.

2. Trade Commission v. Skaggs Drug Centers, Inc., 21 Utah 2d 431, 446 P.2d 958 (1968); Gabler v. Utah State Teachers Retirement Board, 113 Utah 188, 192 P.2d 580, 20 A.L.R.2d 1022 (1948); Snow v. Keddington, 113 Utah 325, 195 P.2d 234 (1948).