TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

JOHN K. VAN DE KAMP
Attorney General

------------------------------
:
OPINION            :
:
of               :
:
JOHN K. VAN DE KAMP     :        No. 87-1204
Attorney General     :
:        <u>JULY 20, 1988</u>
RODNEY O. LILYQUIST    :
Deputy Attorney General   :
:
----------------------------------------------------------------

THE HONORABLE TOM BANE, MEMBER OF THE CALIFORNIA ASSEMBLY, has requested an opinion on the following question:

Does the State Controller have the authority to audit the expenditures from the Assembly Contingent Fund?

CONCLUSION

The State Controller has constitutional authority to audit the expenditures from the Assembly Contingent Fund to determine whether issuance of a warrant would be lawful.

ANALYSIS

The Assembly Contingent Fund ("Fund") is part of the State Treasury "available for the expenses of the Assembly and legislative committees thereof." (Gov. Code, § 9127.)[1] Expenditures from the Fund pay for such expenses as office supplies, telephone, newsletters, and postage. (See § 9133.)[2] The question presented for resolution is whether the State Controller has the authority to audit Fund expenditures. We conclude that he does.

_____

[1]All references hereafter to the Government Code are by section number only.

[2]The Senate has a similar fund. (§ 9126.)

The State Controller holds an elected, constitutional office (Cal. Const., art. V, § 11) responsible for drawing warrants upon the State Treasury. Section 7 of article XVI of the Constitution states: "Money may be drawn from the Treasury only through an appropriation made by law and upon a Controller's duly drawn warrant."

By statute the State Controller is required to audit virtually all claims filed against the Treasury. Section 925.6 provides:

"The Controller shall not draw his warrant for any claim until it has been audited by him in conformity with law and the general rules and regulations adopted by the board, governing the presentation and audit of claims. Whenever the Controller is directed by law to draw his warrant for any purpose, the direction is subject to this section, unless it is accompanied by a special provision exempting it from this section."[3]

An "audit" involves the examination of a claim or expenditure to determine whether it is correct and proper. The extent of any audit depends upon the individual circumstances as well as legal requirements and applicable professional standards. A full and complete audit by the State Controller would ascertain that the claim is numerically correct, actually incurred by the appropriate person or entity for a lawful purpose, and that sufficient funds exist for payment from an appropriation made by law. (See §§ 9133, 10520, 12400; Cal. Code of Regs., tit. 2, §§ 620-625; Madden v. Riley (1942) 53 Cal.App.2d 814, 818-821; Brandt v. Riley (1934) 139 Cal.App. 250, 256-257.) In short, the audit of a claim by the State Controller constitutes the investigation necessary to determine whether issuance of a warrant for the claim would be lawful.

The mandatory audit procedure of section 925.6, however, is inapplicable to expenditures made from the Fund. Section 9130 states:

"Expenditures from the Senate Contingent Fund, the Assembly Contingent Fund, and from appropriations made for legislative printing are not subject to the provisions of Section 925.6 or 13320 of this code, except that the State Controller is not required to draw warrants thereon until the original claims and vouchers, itemized and properly sworn to, are filed with him."[4]

---

[3]The "board" is the State Board of Control. (§ 925.) Its regulations governing the presentation and auditing of claims are found in California Code of Regulations, title 2, section 601 et seq.

[4]Section 13320 specifies that state agencies are to submit budgets "setting forth all proposed expenditures and estimated revenues for the ensuing fiscal year."

Under section 9130, then, the State Controller appears to be restricted in his audit procedures to requiring the submission of original claims and vouchers that are "itemized and properly sworn to."[5]

We note that Fund expenditures are subject to a detailed audit "in accordance with generally accepted auditing standards established by the American Institute of Certified Public Accountants" performed by an independent auditor. Section 9133 provides:

"(a) The Joint Rules Committee shall annually contract for an independent audit or audits of the expenditures of the Assembly Contingent Fund, the Senate Contingent Fund, the Contingent Funds of the Assembly and Senate, expenditures for legislative printing, and General Fund expenditures for reimbursement of Members of the Legislature pursuant to Sections 8902 and 8903. These audits shall be made in accordance with generally accepted auditing standards established by the American Institute of Certified Public Accountants.

"(b) These audits shall each include, but need not be limited to, an evaluation of:

"(1) The expenditures in the following categories:

"(A) Out-of-state travel and living expense reimbursement and in-state travel and living expense reimbursement.

"(B) Automotive expenses.

"(C) Rent.

"(D) Telephone.

"(E) Postage.

"(F) Printing.

"(G) Office supplies.

---

[5]Similar to section 9130 is section 925.2 which provides:

"Claims for expenses of either house of the Legislature or members or committees thereof, and claims for official salaries fixed by statute, are exempt from this chapter and Section 13920."

"This chapter" contains sections 925-926.10; "section 13920" concerns the rule-making authority of the State Board of Control.

"(H) Newsletters.

"(I) Per diem for attendance at legislative sessions.

"(2) The accuracy of the annual fiscal year financial statements of the rules committees.

"(c) These independent audits shall be completed, and reports thereon made to the respective houses of the Legislature, by November 30 of each year for the previous fiscal year ending June 30."

Section 9133, however, does not assure that a warrant drawn by the State Controller in payment of a claim against the Fund will be for a lawful amount.  The additional requirements of section 9130 for "the original claims and vouchers, itemized and properly sworn to" do not guarantee correctness of the claim or the lawfulness of the State Controller's warrant.  Indeed, the Legislature has recognized that a claim filed against the Fund may be materially false.  (See § 9130.5.)  Not only may an excessive claim violate statutory law, its payment may violate the Constitution.  (See Cal. Const., art. IV, §§ 4, 17; Giss v. Jordan (1957) 82 Ariz. 152 [309 P.2d 779, 781, 788].)

It cannot be seriously argued that the Legislature may direct the State Controller to draw a warrant for an improper and excessive claim filed against the Fund.  We believe that the Constitution prohibits him from paying such a claim.  "Money may be drawn from the Treasury only . . . . upon a Controller's duly drawn warrant."  (Cal. Const., art. XVI, § 7.)  The term "duly" commonly means "as is right and fitting."  (Webster's New Internat. Dict. (3d ed. 1971) p. 700.)  It signifies correctness, propriety, validity, and that which is legally required.  (See Van Denburgh v. Goodfellow (1941) 19 Cal.2d 217, 222; Bienfield v. Van Ness (1917) 176 Cal. 585, 589; Matter of Application of Clary (1906) 149 Cal. 732, 735; Williams v. Bergin (1900) 127 Cal. 578, 580; Freshour v. Hihn (1893) 99 Cal. 443, 446.)  A duly drawn warrant is one that is drawn for a lawful amount.

In Flournoy v. Priest (1971) 5 Cal.3d 350, the Supreme Court described the constitutional requirement of a "duly drawn warrant" as follows:  "The obvious purpose of this requirement is to insure the Controller's concurrence in the expenditure of state funds."  (Id. at p. 354.)  If the expenditure is "authorized and approved by the Controller," the constitutional requirement is met.  (Ibid.)

The State Controller thus has constitutional authority to concur in all expenditures from the Treasury.  In order to perform his constitutional duties, he necessarily is required to examine each claim, investigate it, and make the determination that it is lawful.  In short, the State Controller has the constitutional authority to audit claims filed against the Treasury including those filed against the Fund.

The Supreme Court has long recognized and upheld the inherent and traditional duties of state officers even where they are not expressly provided for in the Constitution. In Love v. Baehr (1874) 47 Cal. 364, for example, the court examined a requirement of the Constitution of 1849 that the compensation of certain state officers, including the Attorney General, "shall not be increased or diminished during the term for which they shall have been elected." (Id. at p. 367.) The State Treasurer refused to pay the Attorney General for services rendered as a member of the State Board of Examiners since the Legislature had separately established the compensation for such services during the Attorney General's term of office. The court stated the State Treasurer's argument as follows:

> "The argument for the respondent is, that the duties imposed by law upon the Attorney-General as a member of the Board of Examiners constitute a part of his official duties as Attorney-General, and that under the clause of the Constitution just quoted, it is not competent for the Legislature to increase his compensation during the term for which he was elected." (Ibid.)

In response to this argument, the court observed:

> "The Constitution provides for the election of a Secretary of State, Controller, Treasurer, Attorney-General and Surveyor-General, but is wholly silent in respect to the duties to be performed by either, leaving these to be prescribed by the Legislature. The first question to be determined is whether the Legislature has an unlimited discretion in respect to the nature of the duties which it may require to be performed by these officers?" (Ibid.)

The court answered this question as follows:

> "It is admitted that the Constitution contains no express limitation on the power of the Legislature in this particular. But we think a limitation is necessarily implied from the definition of the office. From the earliest period of our history as a nation, almost every State in the Union had a Secretary of State, Controller, Treasurer, and Attorney-General; and the general nature of the duties pertaining to each were perfectly well known to the framers of our Constitution. It is clear beyond controversy, that in establishing similar offices here, the framers of that instrument had reference to the same general class of duties, which it was well known pertained to such offices elsewhere. The Constitution provides for the election of a Superintendent of Public Instruction, whose duties are not defined; and might have provided for the election of a State Geologist. Can it be claimed with any show of reason, that the Legislature could compel either of them to become ex officio Warden of the State Prison or Superintendent of the State Lunatic Asylum? It is not usual in State Constitutions to define the particular duties of subordinate officers; that being the peculiar province of the Legislature, which, it is presumed, will prescribe only such duties as in their nature have heretofore appertained to similar offices elsewhere. In the performance of this duty, the Legislature may rightfully exercise

a wide discretion. It may assign to each of these officers any duties, which, by the most liberal interpretation, can be held to come within the general scope of that class of duties which have usually appertained to such offices, as they were understood by the framers of the Constitution. In cases of doubt, it would be the duty of the Courts, in deference to the legislative authority, to solve the doubt in favor of the power as exercised; and they ought to interfere only in a clear case, when the Legislature has manifestly transcended its authority by imposing upon one of these officers duties which, in their nature, are wholly foreign to his office." (Id. at pp. 367-368.)

The court then contrasted the specified duties given to the members of the State Board of Examiners with the traditional and usual duties of the Attorney General. It concluded:

"Some of these services [rendered by the State Board of Examiners] have not the slightest relation, even upon the most liberal construction, to the duties of an Attorney General, as such duties were generally understood at the adoption of the State Constitution, and as they were doubtless understood by the framers of that instrument. The business of counting money in the treasury, examining books of account, requiring the skill of an expert accountant rather than the professional learning of a lawyer, and the investment of public money in bonds, is wholly foreign to the duties of an attorney, and is no more cognate to them than the management of a State prison or lunatic asylum. The Legislature has no more power to compel the Attorney-General to perform such service as a part of the duties of his office, than it has to compel the Superintendent of Public Instruction to take charge of the State prison, or to perform the duties of State Gauger. The Attorney-General is, therefore, under no obligation to perform such services, and he may decline to perform them, without any breach of his official duty as Attorney-General." (Id. at p. 370.)

As stated in Love v. Baehr, the official duties of the Attorney General "were generally understood at the adoption of the State Constitution" of 1849. The same may be said of the duties of the State Controller, then known as the Comptroller. On September 20, 1849, the delegates at the Constitutional Convention debated whether a Comptroller should be included among the designated constitutional officers:

"Mr. GILBERT moved to strike out the words 'a Comptroller,' He thought it absolutely necessary that we should have as few State officers as possible . . . . Such an officer was not required here where our public improvements and the amount of public funds would be so limited for several years.

"Mr. SHERWOOD hoped the motion would not prevail. The Comptroller is auditor of public accounts, and is a very important officer in that light. As for public improvements, he trusted we would have some before long.

"Mr. McCARVER suggested that the Secretary of State be required to perform the duties of Comptroller.

"Mr. GILBERT said that the business of the Comptroller was simply to audit the accounts of the State Treasurer. In some States there is a Committee of the Legislature to audit the accounts of the Treasurer. In the State of New York a Comptroller is absolutely necessary. The Treasurer in that State is a mere Cashier. The Comptroller is the principal officer. But in California for many years we shall not need an office of this kind. He hoped the House would strike it out and provide, if necessary, for a board of officers of both Houses of the Legislature.

"Mr. McCARVER thought this matter should be left to the Legislature. It is usual in legislative bodies in the States to have frequent settlements with the auditor of public accounts, by a committee appointed for that purpose.

Mr. BOTTS hoped the motion would not prevail. He was in favor of retaining this officer, not only because the Constitution of New York has a Comptroller in it, but because his duties are extremely important. In some of the States they are so important as to be divided between two - a first and second Comptroller. A most wholesome and useful check is created by the union of the two officers; the one is a check upon the other. It is absolutely necessary to have some officer to keep a check upon the public accounts.

"The question was taken on Mr. Gilbert's motion to strike out the words 'a Comptroller,' and decided in the negative." (Browne, Report of the Debates in the Convention of Cal. on the Formation of the State Constitution (1973) p. 162, emphases added.)

Accordingly, the framers of the Constitution of 1849 clearly understood that the significant and primary function of the Comptroller was to "audit the accounts of the State Treasurer."

While the debates leading to the adoption of the Constitution of 1879 with respect to the duties of the State Controller are not particularly helpful (see Willis & Stockton, Debates and Proceedings of the Constitutional Convention of the State of Cal. (1881) pp. 363, 740, 783-793, 1252-1254, 1444-1445, 1496-1497, 1512, 1521), the convention delegates did expressly add the requirement of a "duly drawn warrant" for expenditures from the Treasury. As found by the Supreme Court in Flournoy v. Priest, supra, 5 Cal.3d 350, 354, this language was specifically incorporated into the Constitution "to assure the Controller's concurrence in the expenditure of state funds." Meaningful concurrence necessarily requires the development of information through normal auditing procedures concerning the claims filed for payment.

The Legislature may not by statute defeat or materially impair the constitutional powers of state officers. (See Hustedt v. Workers' Comp. Appeals Bd. (1980) 30 Cal.3d 329, 338; Solberg v. Superior Court (1977) 19 Cal.3d 182, 191-192; Estebar v. Municipal Court (1971) 5 Cal.3

119, 127.)  We believe that if section 9130 were interpreted in a restrictive manner so as to remove the State Controller's constitutional powers to audit claims, it would be void and unenforceable.[6]

In 2 Ops.Cal.Atty.Gen. 360, 361 (1943), Ops.Cal.Atty.Gen. NS 3774 (1941), and Ops.Cal.Atty.Gen. 10907 (1936), we recognized the principle that the State Controller has implied constitutional duties beyond the reach of the Legislature.

Our conclusion is supported by numerous cases from other states holding that a constitutional officer has implied powers inherent and essential to the office which the legislative branch of government may not abrogate. (See State ex rel. Mattson v. Kiedrowski (Minn. 1986) 391 N.W.2d 777, 780-782; Murphy v. Yates (1975) 276 Md.App. 475 [348 A.2d 837, 846]; Allen v. Rampton (1969) 23 Utah 2d 336 [463 P.2d 7, 8-12]; Fairbanks v. Stratton (1958) 14 Ill.2d 307 [152 N.E.2d 569, 571-572]; Tucker v. State (1941) 218 Ind. 614 [35 N.E.2d 270, 291-293]; American Legion Post No. 279 v. Barrett (1939) 371 Ill. 78 [20 N.E.2d 45, 51]; People v. West Englewood Trust & Sav. Bank (1933) 353 Ill. 451 [187 N.E. 525, 530-531]; Gaston v. Black (1917) 199 Ala. 321 [74 So. 387, 388]; State v. Douglas (1910) 33 Nev. 82 [110 P. 177, 180]; Ex Parte Corliss (1907) 16 N.D. 470 [114 N.W. 962, 964]; State v. Gorby (1890) 122 Ind. 17 [23 N.E. 678, 681]; In re House Resolution Relating to House Bill No. 349 (1889) 12 Colo. 395 [21 P. 486, 487-488].)  With respect to a controller, sometimes referred to as an auditor, the traditional core function of auditing claims is not subject to curtailment by the legislative body.  (See Williams v. State Legislature of Idaho (1986) 111 Idaho 156 [722 P.2d 465, 466-470]; People v. Brady (1917) 277 Ill. 124 [115 N.E. 204, 205-206]; Hicks v. Davis (1917) 100 Kan. 4 [163 P. 799].)  In Giss v. Jordan, supra, 82 Ariz. 152 [309 P.2d 779, 787-788], for example, the court stated:

"It is very essential that the sharp separation of powers of government be carefully preserved by the courts to the end that one branch of government shall not be permitted to unconstitutionally encroach upon the functions properly belonging to another branch, for only in this manner can we preserve the system of checks and balances which is the genius of our government.  The result of attempting to withdraw from the state auditor and to place with a member of the legislature the right to 'audit' the expense claims of the legislative department--one of the co-

---

[6]While section 9130 exempts expenditures from the Fund from the audit requirements of section 925.6, we note that section 12410 provides:

"The Controller shall superintend the fiscal concerns of the state.  The Controller shall audit all claims against the state, and may audit the disbursement of any state money, for correctness, legality, and for sufficient provisions of law for payment.  Whenever, in his opinion, the audit provided for by Chapter 4 (commencing with Section 925), Part 3, Division 3.6 of Title 1 of this code is not adequate, the Controller may make such field or other audit of any claim or disbursement of state money as may be appropriate to such determination."

ordinate and equal branches of government--destroys, to that extent at least, this system of checks and balances."

"  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

"There is no question but that the legislature constitutionally has 'the power of the purse' as no one may expend public funds without legislative sanction; however, we cannot believe that the framers of our constitution ever intended that the legislative branch of the government should, as to the expense claims of its own members, perform the executive function of 'auditing', nor that it was intended any claims for the expenditure of public funds be paid without an audit by some official of the executive department. That power, we hold, was delegated by the Constitution to the executive branch and impliedly placed in the hands of respondent."

In _Preece_ v. _Rampton_ (1972) 27 Utah 2d 56 [492 P.2d 1355, 1357], the court concluded:

"It thus clearly appears that the auditor at and prior to statehood drew all warrants upon the treasurer for the expenditure of money in the state. To take this duty away from the state auditor is to detract from the constitutional duties of his office, which cannot be done.

"The actual typing of the warrants is ministerial in nature, and there is no basis for the auditor to complain if that work is done by the department of finance. However, the presenting of those warrants to the state treasurer calls for discretion, and the auditor should be the one to decide if a warrant is to be presented for payment. It was, and is, the duty of the state auditor to verify the correctness of accounts _before_ they are paid.

"  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

"In the recent case of _Allen_ v. _Rampton_ we held that the constitutional duties of the state treasurer were those being performed by the territorial treasurer at the time of the adoption of the Constitution. In like manner we now hold that the constitutional duties of the state auditor are those which the territorial auditor was then performing and that the constitutional provision that other duties may be imposed upon him does not permit the legislature to relieve him of any of those constitutional duties." (Fn. omitted.)

In _Thompson_ v. _Legislative Audit Commission_ (1969) 79 N.M. 693 [448 P.2d 799, 802], the court observed:

"Although, as stated, the constitution is silent as to the duties of the office (and we would note in passing that there is likewise no specific mention of the duties

of the secretary of state, state treasurer, or attorney general), surely it cannot be logically contended that the failure to prescribe specific duties to the office of state auditor meant that the constitution makers felt that, with the passage of time, there might no longer be any need for such office and that the legislature could, by statute, in effect abolish it. It would seem to us that, both historically and fundamentally, the office of state auditor was created and exists for the basic purpose of having a completely independent representative of the people, accountable to no one else, with the power, duty and authority to examine and pass upon the activities of state officers and agencies who, by law, receive and expend public moneys."

In Hudson v. Kelly (1953) 76 Ariz. 255 [263 P.2d 362, 369], the court stated:

"Who determines whether a valid appropriation has been made for monies proposed to be expended and if funds are available for the payment of any specific claim and if for a public purpose? The answer is the state auditor provided for in the Constitution.

". . . . . . . . . . . . . . . . . . . . . . . .

"To make a free and independent constitutional officer subservient to the dictates of some appointive officer is equivalent to abolishing the office and creating another in lieu thereof to exercise the duties and functions belonging to the first office. It was long ago determined that the legislature has no power to take from a constitutional officer the substance of the office itself, and transfer it to another who is to be appointed in a different manner and will hold the office by a different tenure from that which is provided for by the constitution. [Citation.] A constitutional office cannot be destroyed nor an incumbent legislated out of it in the absence of express constitutional authority [citation], and what may not be done directly cannot be accomplished by indirection."

In Wright v. Callahan (1940) 61 Idaho 167 [99 P.2d 961, 964-966], the court observed:

"At the time of the adoption and ratification of our Constitution the terms 'state auditor' and 'controller,' as evidenced by the constitutions and statutes of that period, were generally and commonly understood to connote a supervising officer of revenue whose duties were to audit all claims against the state. We must presume that the framers of our Constitution so employed the term 'state auditor.' [Citations.]

". . . . . . . . . . . . . . . . . . . . . . . .

"Having concluded the powers and duties conferred upon the territorial controller as an auditor and 'superintendent of the fiscal concerns' and affairs of the territory were, by the adoption of Section 1 of Article IV, supra, impliedly vested in

the State Auditor, the legislature could not, therefore, divest him thereof by creating the office of comptroller and vesting in the comptroller the powers and duties which the Constitution already affixed to the auditor's office." [Citations.]

It is true that <u>Ross</u> v. <u>Whitman</u> (1856) 6 Cal. 361, 362-365, supports the contrary conclusion. <u>Ross</u>, however, dealt with the California Constitution of 1849 with its total absence of any specified duties for the State Controller. As the Supreme Court has recently interpreted the California Constitution of 1879 with its prescribed duty to duly draw warrants against the Treasury, the State Controller impliedly must determine whether the drawing of a warrant would be lawful.

In answer to the question presented, therefore, we conclude that the State Controller has the constitutional authority to audit expenditures from the Fund to determine whether issuance of a warrant would be lawful.

\* \* \* \* \*