569 S.E.2d 99

**STATE of West Virginia EX REL. Darrell V. McGRAW, Jr., in his capacity as Attorney General for the State of West Virginia, Petitioner,**

**v.**

**Gregory A. BURTON, Cabinet Secretary of the Department of Administration; Nichelle Perkins, Director of Personnel and the Department of Administration; Kay Huffman Goodwin, Cabinet Secretary of the Department of Education and the Arts; Mike Callaghan, Cabinet Secretary of the Department of Environmental Protection; Paul Nusbaum, Cabinet Secretary of the Department of Health and Human Resources; Joe Martin,**

Cabinet Secretary of the Department of Military Affairs and Public Safety; Brian Kastick, Cabinet Secretary of the Department of Tax and Revenue; and Fred VanKirk, Secretary of the Department of Transportation, Respondents.

The Public Service Commission of West Virginia; The West Virginia Board of Education, the West Virginia Department of Education and the Superintendent of Schools; The West Virginia Consolidated Public Retirement Board; and The West Virginia Regional Jail and Correctional Facility Authority, Intervenors.

No. 30094.

Supreme Court of Appeals of West Virginia.

Submitted Feb. 5, 2002.

Decided June 10, 2002.

Concurring Opinion of Justice Albright June 11, 2002.

Concurring Opinion of Judge Tod Kaufman June 21, 2002.

Deborah L. McHenry, The Segal Law Firm, Special Assistant Attorney General, Silas B. Taylor, Senior Deputy Attorney General, Charleston, West Virginia, for petitioner.

William C. Porth, Jr., Robinson & McElwee, William E. Adams, Jr., General Counsel, Department of Environmental Protection, Dale W. Steager, Special Assistant Attorney General, Charleston, West Virginia, for respondents Michael Callaghan and Brian Kastick.

Rebecca M. Tinder–Bell, Special Assistant Attorney General, Charleston, West Virginia, for intervenors, West Virginia Board of Education, the West Virginia Department of Education, and the State Superintendent of Schools.

Richard E. Hitt, Charleston, West Virginia, General Counsel, for intervenor, Public Service Commission of West Virginia.

John T. Poffenbarger, Charleston, West Virginia, Thomas B. Miller, Schrader, Byrd & Companion, Wheeling, West Virginia, Heather Connolly, Department of Administration, Charleston, West Virginia, for respondents Gregory A. Burton, Nichelle Perkins, Kay Huffman Goodwin, Paul Nusbaum, Joe Martin, and Fred VanKirk.

Chad M. Cardinal, Charleston, West Virginia, for intervenor, West Virginia Regional Jail and Correctional Facility Authority.

Susan B. Saxe, Charleston, West Virginia, for intervenor, The West Virginia Consolidated Public Retirement Board.

Michael R. Crane, Jennifer Bailey Walker, M.E. "Mike" Mowery, Mark W. McOwen, Charleston, West Virginia, for amici, President of the West Virginia Senate, Earl Ray Tomblin and Speaker of the House of Delegates, Robert S. Kiss.

Rebecca S. Charles, Charleston, West Virginia, for amici, West Virginia Air Quality Board and West Virginia Environmental Quality Board.

Garrett Jacobs, Deputy Commissioner and General Counsel, Heidi Talmage, Deputy Assistant General Counsel, Kimberly Bentley, Assistant General Counsel, Carol A. Egnatoff, Assistant General Counsel, Bureau of Child Support Enforcement, Charleston, West Virginia, amici pro se.

William L. Ballard, Charleston, West Virginia, for amici, Bureau of Employment Pro-

grams and Robert J. Smith, its Commissioner.

Stuart Calwell, Vincent Trivelli, Charleston, West Virginia, for amicus, The Affiliated Construction Trades Foundation, a Division of the West Virginia State Building and Construction Trades Council.

Diana Stout, Charleston, West Virginia, for amicus, West Virginia State Treasurer, John D. Perdue.

Mary Jane Pickens, Charleston, West Virginia, Associate Counsel for amicus, West Virginia Insurance Commissioner.

Bruce Ray Walker, Charleston, West Virginia, General Counsel for amicus, West Virginia Higher Education Policy Commission.

Lisa A. Hopkins, Charleston, West Virginia, General Counsel for amicus, West Virginia State Auditor, Glen B. Gainer, III.

Ancil Ramey, Steptoe & Johnson, PLLC, Charleston, West Virginia, Brendan V. Sullivan, Mary G. Clark, Williams & Connolly, LLP, Washington, D.C., for amicus, Steptoe & Johnson.

S. Thornton Cooper, Charleston, West Virginia, amicus pro se.

Gregory W. Bailey, Rochelle Glover, Howard E. Seufer, Jr., Bowles Rice McDavid Graff & Love, PLLC, Charleston, West Virginia, for amici, Boards of Governors of Bluefield State College, Concord College, Eastern West Virginia Community and Technical College, Fairmont State College, Glenville State College, Marshall University, Shepherd College, Southern West Virginia and Technical College, West Liberty State College, West Virginia School of Osteopathic Medicine, and West Virginia University.

Alan M. Drescher, Charleston, West Virginia, for amicus, Timothy G. Leach, Chief Administrative Law Judge, Workers' Compensation Office of Judges.

Chief Justice DAVIS, deeming herself disqualified, did not participate in the decision of this case.

Judge TOD KAUFMAN, sitting by temporary assignment.

Justice ALBRIGHT concurs and reserves the right to file a concurring opinion.

Judge KAUFMAN concurs and reserves the right to file a concurring opinion.

STARCHER, Justice.

This is a case where the Attorney General of the State of West Virginia claims that executive branch agencies and officials are violating our State's *Constitution* by using lawyers who are not employed or approved by the Attorney General. Through his petition, the Attorney General asserts that the respondents have a clear legal duty to cease authorizing the "unlawful" employment of lawyers by executive branch and related agencies of the State of West Virginia without the consent of the Attorney General, and to cease the "unlawful" expenditure of public funds for legal services that are performed by lawyers other than those who are employed or approved by the Attorney General. We hold that the employment and use of such lawyers is not barred in all cases; however, we also hold that the Office of the Attorney General may not be stripped of its inherent core functions.

## I.

### *Facts & Background*

The petitioner, the Honorable Darrell V. McGraw, Jr., is the Attorney General of the State of West Virginia ("the Attorney General"), an elected constitutional officer of this State.[1] The Attorney General has filed a petition for a writ of mandamus in this Court, naming as respondents the Secretary of the West Virginia Department of Administration and the Director of the Division of Personnel of the Department of Administration, two officials within the executive branch.

The Attorney General asks this Court to hold unconstitutional any statute that purports to authorize any executive agency, body, or similar instrumentality of the State to employ and use lawyers who are not em-

---

1. Article VII, Sections 1 and 2, *West Virginia Constitution.* We will capitalize most uses of the word "State" in this opinion to show that we are referring to the State of West Virginia.

ployed or approved by the Attorney General; to prohibit payment of public funds for the services of such lawyers; to require the payment of money for all such lawyers to be directed to the budget of the Attorney General; and to deem all such lawyers who are State employees to be employees of the Attorney General.

The Attorney General specifically identifies as "unlawful" 216 State-employed lawyers (in 37 State agencies) who are not employed by the Attorney General;[2] the petition contains averments that state that the Attorney General currently employs only 65 lawyers. The Attorney General

contends generally that as a result of legislation enacted over the past several decades, there has been a "creeping encroachment" and usurpation of the constitutional role of the Attorney General as the State's chief legal officer "to such an extent that the constitutionally-mandated and elected Office of the Attorney General is quickly becoming *de facto* non-existent."[3]

This Court accepted the Attorney General's petition, granted intervenor status to several State officials and entities, and authorized the submission of *amici curiae* responses to the petition from other interested persons and entities.[4] We will, in the follow-

2. *Brief* of the Attorney General. Thirty-seven of these non-Attorney General-employed lawyers are administrative law judges. *See* Appendix for a list of non-Attorney General State-employed attorney positions, their agency employers, and the statutes authorizing such employment, that the Attorney General has attached to his petition. In a reply brief, the Attorney General has removed administrative law judge positions from the ambit of the relief sought in his petition. The Attorney General has also stated in his reply brief that any lawyers who have civil service or similar job security protection in their current employment would continue to have such protection if transferred to his employment. The Attorney General's current lawyer employees are stated in the briefs to be will-and-pleasure employees.

3. *Brief* of the Attorney General. Most recently, in 2002, the Legislature enacted House Bill 4010, adding *W.Va.Code*, 11-1-1a [2002] and 31A-2-4b 0[2002], statutes that authorize the Commissioners of Banking and Taxation to use and employ non-Attorney General-employed or -approved lawyers for, *inter alia*, representation in court. Assuming that legal work is roughly proportionate to the number of lawyers doing the work, the undisputed numbers in the Attorney General's petition suggest that the Attorney General's office currently does not play any role with respect to approximately 75% of the professional legal services that are provided by public employee lawyers to State executive branch agencies and related entities. We note that legal services are also provided to the State of West Virginia and its employees by lawyers who are not public employees. The State Board of Risk and Insurance Management, for example, uses insurance companies and private providers of legal services to respond to liability claims against State agencies, officials, employees, instrumentalities, political subdivisions, and others. *W.Va.Code*, 29-12-1 to 29-12-13. *See Russell v. Bush & Burchett*, 210 W.Va. 699, 704-706 n. 7-10, 559 S.E.2d 36, 41-43 n. 7-10 (2001). The Attorney General's petition and brief do not specifically discuss the issue of the provision of legal services to the State by

non-State employees. However, this is an issue that is substantially related to the principles that we discuss herein, and we address it generally at note 25 *infra*.

4. We have before us briefs from the President of the West Virginia Senate; the Speaker of the West Virginia House of Delegates; the Affiliated Construction Trades Foundation; the West Virginia Board of Education, Department of Education, and State Superintendent of Schools; the West Virginia Insurance Commissioner; the West Virginia Higher Education Policy Commission; the Chief Administrative Law Judge of the Workers' Compensation Office of Judges; Thornton Cooper; Steptoe & Johnson PLLC; Kimberly Bentley, Carol Egnatoff, Garrett Jacobs, and Heidi Talmage; the West Virginia Regional Jail and Correctional Facility Authority; the West Virginia State Auditor; the Boards of Governors of Bluefield State College, Concord College, Eastern West Virginia Community and Technical College, Fairmont State College; Glenville State College, Marshall University, Shepherd College, Southern West Virginia Community and Technical College, West Liberty State College, West Virginia School of Osteopathic Medicine, and West Virginia University; the West Virginia Public Service Commission; the West Virginia Consolidated Retirement Board; and the Cabinet Secretaries of the Department of Education and the Arts, Department of Environmental Protection, Department of Health & Human Resources, Department of Military Affairs and Public Safety, Department of Tax and Revenue, and the Department of Transportation.

Each of these well-prepared briefs has aided this Court in consideration of the issues in the instant case, especially as they pertain to the party submitting the brief. The large number of briefs submitted and arguments presented therein precludes separately discussing each of the issues raised in each submission. But this omission does not reflect any lack of appreciation by this Court for the importance of the instant case

ing discussion, use the term "respondents" to include all of the State entities and officials—whether or not they have been formally granted intervenor status—that have filed briefs opposing the relief sought by the Attorney General's petition; and we will include in the generic term "State entity" both "public" bodies (*see* note 17 *infra* ) and the individuals (usually public officials and employees) who do the work of these public bodies, unless a different meaning is indicated in the text.[5]

## II.

### *Standard of Review*

◼ As we stated in *State ex rel. West Virginia Deputy Sheriff's Ass'n, Inc. v. Sims,* 204 W.Va. 442, 444, 513 S.E.2d 669, 671 (1998):

This is an original jurisdiction proceeding. Consequently, we are not directly reviewing a ruling or determination by a lower tribunal. Our standard for original mandamus jurisdiction has been recently stated as:

"A writ of mandamus will not issue unless three elements coexist—(1) a clear legal right in the petitioner to the relief sought; (2) a legal duty on the part of respondent to do the thing which the petitioner seeks to compel; and (3) the absence of another adequate remedy."

Syllabus Point 1, *State ex rel. Billy Ray C. v. Skaff,* 190 W.Va. 504, 438 S.E.2d 847 (1993). [citations omitted].

The Attorney General's petition raises important issues of State-wide and constitutional significance. Our discretionary exercise of original jurisdiction in mandamus to address these issues is appropriate. *Cf. Manchin v. Browning,* 170 W.Va. 779, 296 S.E.2d 909 (1982).

## III.

### *Discussion*

#### A.

The Office of Attorney General of the State of West Virginia is established by Arti-

cle VII, Section 1 of the *West Virginia Constitution:*

The executive department shall consist of a governor, secretary of state, auditor, treasurer, commissioner of agriculture *and attorney general,* who shall be, ex officio, reporter of the court of appeals. . . . They shall reside at the seat of government during their terms of office, keep there the public records, books and papers pertaining to their respective offices and shall perform *such duties as may be prescribed by law.*

(Emphasis added.)

No other constitutional language more specifically defines or delineates the Attorney General's constitutional role as a member of the executive department. Based on this lack of other specific constitutional language—and based on the "as may be prescribed by law" language quoted above—the respondents argue that the Legislature has essentially plenary and unfettered discretion to, through statutory action, delineate, limit, or even effectively eliminate the Attorney General's role in providing legal counsel and representation to State entities. *Lawson v. Kanawha County Court,* 80 W.Va. 612, 618, 92 S.E. 786, 789 (1917) ("The phrases 'prescribed by law' and 'provided by law,' when used in constitutions, generally mean prescribed or provided by statutes.")

For example, the brief on behalf of the Cabinet Secretaries of the Departments of Environmental Protection, Tax and Revenue, Education and the Arts, Health & Human Resources, Military Affairs & Public Safety, and Transportation states:

According to the scheme of the Constitution, for example, the Legislature might have decided (or might decide in the future) that, as far as other officers in agencies in State government are concerned, the Attorney General should have purely

---

to the individual respondents, intervenors, and *amici curiae.*

**5.** It should be noted that the discussion herein regarding the Attorney General's role with re-

spect to the legal affairs of State entities is confined to entities within and related to the executive branch, and not the judicial or legislative branches.

advisory duties and no representational duties. The Legislature could have created or could create the office of "solicitor general," wholly independent of the office of Attorney General, which would be available to represent the State in courts and perform other representational functions, while the Attorney General tends to analyzing questions presented to him and to issuing advisory opinions. Since the Constitution has not mandated a representational function for the Attorney General, the Legislature is free to prescribe that duty for him, or for some other office altogether. ·

At oral argument in the instant case, counsel for these Secretaries stated that the constitutional propriety of the above-quoted hypothetical elimination of the Attorney General's representational role was counsel's personal view, and not his clients' position in the instant case. However, the respondents' briefs uniformly assert as a premise of their arguments the theoretical ability of the Legislature (or other officials in the executive branch, if authorized by the Legislature) to reduce the practical role of the Office of the Attorney General in the State's day-to-day legal affairs to a nullity. This overweening assertion of Legislative "discretion" is the "flip side" of the Attorney General's assertion of exclusive "jurisdiction" with respect to all legal matters of any sort in which the State is involved. We conclude that both sides are overreaching in their assertions.

This is not the first time this Court has had to wrestle with the question of the essential or inherent powers and duties of the Office of the Attorney General. In Syllabus Point 2 of *State v. Ehrlick*, 65 W.Va. 700, 64 S.E. 935 (1909), this Court concluded that the Office of Attorney General held such powers

as did attorneys general under the common law, subject to redefinition from time to time by the Legislature. We addressed this issue again in *Manchin v. Browning*, 170 W.Va. 779, 296 S.E.2d 909 (1982). We concluded there that the Attorney General did *not* possess powers arising under the common law. 170 W.Va. at 785, 296 S.E.2d at 915.

We concluded in *Manchin* that the phrase "shall perform such duties as may be prescribed by law" operated to defeat the assertion that the Attorney General of West Virginia possesses common-law powers. We held in Syllabus Point 1 of *Manchin* that "the powers and duties of the Attorney General are specified *by the constitution* and by rules of law *prescribed pursuant thereto*." (Emphasis added.) We observed that: "The plain effect of the provision is to limit the powers of the Attorney General to those conferred by law laid down *pursuant to the constitution*."[6] 170 W.Va. at 785, 296 S.E.2d at 915. (Emphasis added.)

Notwithstanding this "plain effect," we concluded in *Manchin* that the Attorney General is the "chief legal officer" of the State, 170 W.Va. at 787, 296 S.E.2d at 917, charged with representing the interests of the State in actions wherein the State is a party and charged with representing the State's officers in actions wherein the officer was a party by reason of being the State's representative.[7] We required there that when the Attorney General represents a State officer, rather than the State itself, the Attorney General was required to advocate the policy position of the State officer in that litigation, even when the officer's policy position differed from that preferred by the Attorney General.

Most importantly, we said in *Manchin*:

> enable the [constitutional officer] to perform the functions for which the office was created." *Id.*

**6.** *Manchin* relied in part upon *Shute v. Frohmiller*, 53 Ariz. 483, 488, 90 P.2d 998, 1001 (1939), which stated in pertinent part that the "powers and duties [of the Attorney General] may be ascertained *only* by resort to the statutes." (Emphasis added.) *Manchin*, 170 W.Va. at 786, 296 S.E.2d at 916. However, this holding of the *Shute* case was explicitly, and we believe properly, overruled by *Hudson v. Kelly*, 76 Ariz. 255, 261–264, 263 P.2d 362, 366–367 (1953). In *Hudson*, the language "prescribed by law" was held to be an "implied mandate" to the Legislature to "grant such powers and duties as would

**7.** The duty to represent a State officer appearing in his or her public capacity was said in *Manchin* to be subject to the caveat that if the State was interested in the action contrary to the interest of the State officer involved, the Attorney General is bound to represent the interest of the State, to the exclusion of the interest of the particular State officer. 170 W.Va. at 788, 296 S.E.2d at 918.

The Attorney General is more properly designated as the *chief legal officer of the State*, with the law as his area of special expertise. \*\*\* By the nature of his office he is the general lawyer for the State. \*\*\* [E]xplicit in the title Attorney General is the proposition that the holder of the title is the *general lawyer for the State* ...

170 W.Va. at 787–788, 296 S.E.2d at 917–18. (Emphasis added.)

In *State ex rel. Caryl v. MacQueen*, 182 W.Va. 50, 54, 385 S.E.2d 646, 650 (1989), we again addressed the nature of the office, stating: "[E]xplicit in the title attorney general is the proposition that the holder of the title is the general counsel for the State."

From the time West Virginia's *Constitution* was first adopted, there has been consistent legislative recognition of the Attorney General's role as that of the State's chief legal officer, having a central responsibility for providing legal counsel and services to the State and State entities.

The West Virginia Legislature of 1872–73 prescribed the role of the Attorney General as follows:

The Attorney General shall give his opinion and advice in writing whenever required to do so by the governor, or other officers at the seat of government, or by the board of public works.

He shall appear as counsel for the State in all cases in which the state is interested, depending [pending] in the supreme court of appeals or in the circuit court of the county in which the seat of government may be.

*1872–73 W.Va.Acts*, chapter 54, pp. 141–142.

In 1909, the federal courts were added to the named forums in which the Attorney General "shall appear as counsel for the state," and the Attorney General was further required to "defend all actions and proceedings against any state officer in his official capacity ..., but should the state be interested against such officer, he shall appear for the state; ...." Chapter 120, Section 2, *Barnes' W.Va.Code* 1923, p. 2127 [1909].[8]

■ Long-standing principles of constitutional construction provide that:

A contemporaneous and long-standing legislative construction of a constitutional provision is entitled to significant weight.... [W]here there has been a practical construction which has been acquiesced in for a considerable period, considerations in favor of adhering to this [constitutional] construction sometimes present ... a plausibility and force which is not easy to resist.

*State ex rel. Board of University v. City of Sherwood*, 489 N.W.2d 584, 587–588 (N.D. 1992). (Citations omitted.)[9]

■ We believe it is clear from these authorities that there are certain core functions of the Office of Attorney General that are inherent in the office, of which the Office of Attorney General may not be deprived, and which may not be transferred to or set up in conflict with other offices. The suggestion by some of the respondents that the Legislature possesses unfettered discretion to define, delineate, and limit the duties of the Attorney General is wholly at odds with the historical and well-settled understanding of the constitutional role of the Attorney General. Accordingly, we hold that pursuant to Article VII, Section 1 of the *West Virginia Constitution*, the Attorney General of the State of West Virginia is the State's chief legal officer, which status necessarily implies

8. Similar provisions remain in effect today. *See* W.Va.Code, 5-3-2 [1987], discussed in more detail later in this opinion. Most recently, the 2002 Legislature enacted Senate Bill 667, creating W.Va.Code, 55–17–1 to 55–17–5. While we express no opinion regarding this legislation, we do observe that it requires notice to government agencies *and the Attorney General* of intended litigation against such agencies, *and service of all legal complaints on the Attorney General*. This Legislative action reflects the continued and common-sense legislative recognition of the inherent central role that the Attorney General plays in the legal affairs of the State, particularly when the State's interests may be before a tribunal.

9. *See also State ex rel. Linde v. Robinson*, 35 N.D. 417, 160 N.W. 514 (N.D.1916), where in interpreting a constitutional provision the court turned to the earliest interpretations of the provision by the Legislature as manifested in the first laws passed following the constitution's adoption.

having the constitutional responsibility for providing legal counsel to State officials and State entities. The nature and extent of that "constitutional responsibility" remains to be hereinafter analyzed.

### B.

Pursuant to Article IV, Section 8 of the *West Virginia Constitution,* the Legislature has broad powers with respect to delineating the role, powers, and duties of *non-constitutional* public officers:

> The legislature, in cases [of offices] not provided for in this Constitution, shall prescribe, by general laws, the terms of office, powers, duties and compensation of all public officers and agents, and the manner in which they shall be elected, appointed and removed. [*Id.*]

However, it has been long recognized that this power of the Legislature to create offices in addition to those created in the *Constitution* is necessarily constrained by proper respect for the offices created by and enumerated in the *Constitution.* "The legislature, of course, cannot create offices which will conflict with, or curtail the constitutional powers of, any of the offices provided for by the Constitution." *Blue v. Smith,* 69 W.Va. 761, 762, 72 S.E. 1038, 1039 (1911). Additionally, "[t]o transfer the duties of one office to another is to abolish the former and a legislative act attempting to do so, in the case of a constitutional office, is void for that reason." *Hatfield v. County Court of Mingo County,* 80 W.Va. 165, 168, 92 S.E. 245, 246 (1917).[10]

Other jurisdictions have taken a similar approach. In *State ex rel. Mattson, Treasurer v. Kiedrowski,* 391 N.W.2d 777, 782 (Minn. 1986), the Minnesota court stated:

> The mandate in Section 1 of Article V, that the executive department consist of a governor, lieutenant governor, secretary of state, auditor, treasurer and attorney general, implicitly places a limitation on the

power of the legislature, under Section 4 of Article V, to prescribe the duties of such offices. The limitation is implicit in the specific titles the drafters gave to the individual offices.

In *Love v. Baehr,* 47 Cal. 364, 368 (1874), the California Supreme Court held that the legislative power to assign duties to constitutional offices was limited to "such duties as in their nature have heretofore appertained to similar offices elsewhere." Similarly, the Supreme Court of North Dakota stated in *Ex Parte Corliss,* 16 N.D. 470, 476–477, 114 N.W. 962, 965 (1907):

> We do not deny the power of the Legislature to prescribe duties for these officers, which power carries with it by implication the right to change such duties from time-to-time as the public welfare may demand; but we deny its power to strip such offices, even temporarily, of a portion of their inherent functions and transfer them to officers appointed by central authority.

In *American Legion Post No. 279 v. Barrett,* 371 Ill. 78, 91, 20 N.E.2d 45, 51 (1939), the Supreme Court of Illinois stated:

> The constitution ... provides that public officers, including the State Treasurer, shall perform such duties as may be required by law. Nothing in the constitution further defines the duties of the State Treasurer. This Court has held that those duties are such as are to be implied from the nature of the office and of them he may not be deprived or relieved. [citations omitted].

And in *Wright v. Callahan,* 61 Idaho 167, 181, 99 P.2d 961, 966 (1940) the Supreme Court of Idaho held:

> [T]o permit the legislature to create an office and invest in the appointee the powers and duties conferred upon a constitutional officer, would be to permit the legislature to nullify the Constitution and reduce it to a mere scrap of paper.[11]

---

10. *See also State ex rel. Joint Comm. v. Bonar,* 159 W.Va. 416, 419, 230 S.E.2d 629, 631 (1976) (each department of government has certain inherent powers without which its specific powers would be meaningless).

11. *See also Murphy v. Yates,* 276 Md. 475, 492, 348 A.2d 837, 846 (1975) ("If an office is created by the Constitution ... the position can neither be abolished by statute nor reduced to impotence by the transfer of duties characteristic of the office to another office created by the legislature.... We regard this as but another facet of

The executive branch, as well as the Legislature, is similarly constrained with respect to the inherent or core functions of constitutional offices. In a case holding that the Governor may not by veto reduce to zero the appropriations necessary to the operation of certain constitutional offices, this Court stated:

> Clearly, the framers of the Constitution and the people intended that these [constitutional] officers function as a viable part of the governmental process. How then can it be reasoned that the Governor, also no more than a constitutional officer, can eliminate and prohibit the function of these offices?

*State ex rel. Brotherton v. Blankenship,* 157 W.Va. 100, 118, 207 S.E.2d 421, 432 (1973).

The fundamental principle involved in all of these cases is the doctrine of separation of powers. In the case before us, the doctrine has two aspects. One aspect is the constitutional inability of the Legislature to define the powers and duties of the Office of Attorney General and the other constitutional offices so as to deprive the Office of Attorney General, or any of the other constitutional offices, of the inherent functions and purposes thereof. The second aspect is the maintenance of the concept of an executive branch that is itself divided among the several constitutional offices provided for in the *Constitution,* each with a separate, distinct, and vital contribution to be made to the operation of the executive branch.

> the principle of separation of powers....''); *see also Allen v. Rampton,* 23 Utah 2d 336, 463 P.2d 7 (1969); *State ex rel. Collett v. Gorby,* 122 Ind. 17, 23 N.E. 678 (1890).

**12.** As of 1990, 43 of 50 state constitutions provided for the election of the attorney general. *State Attorneys General, Powers and Responsibilities,* National Association of Attorneys General, Lynne M. Ross, ed., 1990, p. 15. It has been observed that ''some of our States' most interesting legal and political infighting has been between the governor as the chief executive officer of the State and the attorney general as the chief legal officer. It is clear that these two offices do have the potential for built-in conflict at several levels, from politics to policy to administration.'' Thad L. Beyle, in *Politics in the American States* 191–192, Virginia Gray *et al.* eds., 4th ed. (1983).

Unlike the federal government, where essentially the entire executive power is vested in one elected officer, the President of the United States, our State *Constitution* apportions executive power among several elected officers. These offices, each operating in some respects independently, must combine and cooperate (even if they have differing policy views and perspectives) to provide an efficient and effective executive branch of government.[12]

The doctrine of separation of powers is expressed in Section 1, Article V of our *Constitution:*

> The legislative, executive and judicial departments shall be separate and distinct, so that neither shall exercise the power properly belonging to either of the others; nor shall any person exercise the powers of more than one of them at the same time....

This Court has repeatedly and steadfastly required adherence to the separation of powers doctrine.

> Thus, we have recognized the need for some flexibility in interpreting the separation of powers doctrine in order to meet the realities of modern day government and particularly the proliferation of administrative agencies. We have not however hesitated to utilize the doctrine where we felt there was a direct and fundamental encroachment by one branch of government into the traditional powers of another branch of government.

*Appalachian Power Co. v. PSC,* 170 W.Va. 757, 759, 296 S.E.2d 887, 889 (1982).[13]

**13.** In *Appalachian Power,* the Legislature had granted broad contempt powers to the Public Service Commission—powers that were that were explicitly co-extensive with the contempt powers of a circuit court. While we acknowledged the quasi-judicial character of the PSC, we held that the legislative action unconstitutionally usurped the traditional role of the judicial branch in the area of contempt. We stated in *Appalachian Power* that ''[t]he traditional method of enforcing administrative agency subpoenas is for the agency to be empowered to apply to the courts if there is a refusal to respond to the subpoena.'' 170 W.Va. at 761 n. 8, 296 S.E.2d at 890 n. 8.

In *State ex rel. Meadows v. Hechler,* 195 W.Va. 11, 14, 462 S.E.2d 586, 589 (1995), we stated:

> The separation of powers doctrine expressly stated in our constitution is a core principle of our system of government, whose roots can be traced back to the founding of this country. *See Hodges v. Public Serv. Comm'n,* 110 W.Va. 649, 652–54, 159 S.E. 834, 835–36 (1931) (discussing the origin of the separation of powers principle and noting "that the very first resolution passed in the convention which framed our national Constitution called for a separation of governmental powers [.]") ... In *State ex rel. State Building Commission v. Bailey,* 151 W.Va. 79, 150 S.E.2d 449 (1966), we discussed this fundamental precept of government:

> > The Constitution, in distributing the powers of government, creates three distinct and separate departments—the legislative, the executive, and the judicial. This separation is not merely a matter of convenience or of governmental mechanism. Its object is basic and vital, namely, to preclude a commingling of these essentially different powers of government in the same hands. \*\*\*.

> > If it be important thus to separate the several departments of government and restrict them to the exercise of their appointed powers, it follows, as a logical corollary, equally important, that each department should be kept completely independent of the others—independent not in the sense that they shall not cooperate to the common end of carrying into effect the purposes of the Constitution, but in the sense that *the acts of each shall never be controlled by, or subjected, directly or indirectly, to, the coercive influence of either of the other departments....* [emphasis in original].

> > > \* \* \*

> We crystallized the significance of the separation of powers doctrine in Syllabus Point 1 of *State ex rel. Barker v. Manchin,* 167 W.Va. 155, 279 S.E.2d 622 (1981):

> > Article V, section 1 of the Constitution of West Virginia which prohibits any one department of our state government

from exercising the powers of the others, is not merely a suggestion; it is part of the fundamental law of our State and, as such, it must be strictly construed and closely followed.

(Citations and footnotes omitted.)

▉ With the principles underlying these cases in mind, we therefore hold, pursuant to the separation of powers doctrine set forth in Article V, Section 1, of the *West Virginia Constitution,* that the Legislature cannot create offices that will conflict with or curtail the constitutional powers of the offices provided for by the *Constitution;* and to transfer the inherent functions of a constitutional office to another office is to curtail the former. Therefore, a legislative act that attempts to accomplish such a transfer is unconstitutional.

### C.

The Attorney General argues that whenever the Legislature authorizes the provision of legal services to a State entity by a lawyer who is not employed by or with the consent of the Attorney General, the constitutional scheme that creates the Office of Attorney General as that of the State's chief legal officer is violated, because that office is being stripped of its inherent functions in violation of the separation of powers doctrine.

The Attorney General urges us to treat the Office of Attorney General as possessing exclusive constitutional authority with regard to legal representation of the various entities of State government, because the office is an elective one, and because, as we discuss herein, the Office of Attorney General historically functioned for some time as essentially the sole source of legal counsel and legal representation for all of the entities of State government.

This Court recognized in *Manchin, supra,* that the Legislature had authorized some executive department agencies to "hire their own counsel using agency funds." 170 W.Va. at 788, n. 4, 296 S.E.2d at 917–918, n. 4. And we held in Syllabus Point 2 of *State ex rel. Caryl v. MacQueen,* 182 W.Va. 50, 385 S.E.2d 646 (1989) that: "The Attorney General is the legal representative of the State

and its agencies *unless specifically exempted from his duty by statute.*" (Emphasis added).[14] In neither of those cases did we intimate that the Legislature may not under any circumstances authorize the use of legal counsel other than the Attorney General—nor did we in either case intimate that the Legislature had *carte blanche* to eviscerate the role of the Attorney General as the State's chief legal officer.

As the Supreme Court of Kentucky stated in *Johnson v. Commonwealth ex rel. Meredith,* 291 Ky. 829, 844, 165 S.W.2d 820, 829 (1942):

> [T]he General Assembly may ... authorize the employment of other counsel for the departments.... [However, the *Johnson* court went on to say] as the legislature cannot abolish the office directly, it cannot do so indirectly by depriving the incumbent of all of his substantial prerogatives *or by practically preventing him from discharging the substantial things appertaining to the office.*

(Emphasis added).[15]

The decision of West Virginia's founders to have a chief legal officer for the State cannot be treated as merely a relic from the past that has no practical force and vital importance in modern times. To the contrary, the Attorney General's constitutionally established role of chief legal officer for the State must be given as full an expression today as it was in the past.

The fundamental reason that all three branches of our State government must accord the Office of Attorney General and all constitutional offices appropriate respect and dignity rests on the fact that the people, by their *Constitution,* have spoken clearly and decisively in creating these offices. As we stated in *State ex rel. Brotherton v. Blankenship,* 157 W.Va. 100, 119–120, 207 S.E.2d 421, 433 (1973):

> On many occasions it has been suggested to the people that the election of Secretary of State, Auditor, Treasurer, Commissioner of Agriculture and Attorney General be eliminated and that the appointment to such offices be left to the discretion of the Governor. As of this date such concept has not been approved by the electorate and the Governor cannot achieve that end without such approval.... It would defy reality and reason to say that [these] officers could conduct the business of such offices, *as intended by the people,* without any funds with which to operate and personnel to assist them. [emphasis added][16]

14. As early as 1915, the Legislature empowered the Public Service Commission to employ non-Attorney General lawyers. *W.Va.Code,* 24–1–8 [1915], 1915 *Acts of the Legislature,* chapter 8, p. 43. The Department of Transportation was given specific authority to hire non-Attorney General lawyers in 1957, *W.Va.Code,* 17–2A–7 [1957]. *See* Appendix for other statutory references. Concerns about the excessive use of non-Attorney General lawyers by the State have been raised by previous Attorneys General. *See, e.g.,* 50 W.Va. Attorney General Reports, 185, 192 (1962–1964); 31 W.Va. AG Reports, xii–xv, p. 241 (1925–26).

15. *See also Hansen v. Utah Retirement Bd.,* 652 P.2d 1332 (1982) (constitutional provision that attorney general was legal adviser to State officers did not prevent independent State agencies from using non-attorney-general lawyers); *Woodahl v. State Highway Commission,* 155 Mont. 32, 465 P.2d 818 (1970) (highway commission could hire non-attorney-general lawyers without attorney general approval); *Padgett v. Williams,* 82 Idaho 28, 348 P.2d 944 (1960) (Legislature could constitutionally allow highway directors to employ non-attorney general lawyers). This Court concluded in *West Virginia Trust Fund, Inc. v. Bailey,* 199 W.Va. 463, 485 S.E.2d 407

(1997) that the West Virginia Trust Fund Act was unconstitutional because it allowed the State to invest in stocks, but that the Act did not unconstitutionally impair the powers of the Treasurer. We declined to directly address what duties were inherent in the Treasurer's constitutional office, stating that the Legislature, *subject to the Constitution,* had substantial discretion with respect to delineating the specific duties of the Treasurer. *Id.,* Syllabus Point 9.

16. "A West Virginia poll in March 1989 resulted in 24% in favor and 63% opposed to abolishing the elected Office of Attorney General. The Gallup Opinion Poll Index: Political, Social and Economic Trends, poll information WVA31989." (reported at Matheson, Scott, "Constitutional Status & Role of the Attorney General," 6 *U.Fla. J.L. & Pub. Pol'y,* 1, 28 n. 145 (1993)). In 1989, a proposed amendment to the *West Virginia Constitution* that would have eliminated the elected offices of Commissioner of Agriculture and Secretary of State was rejected by a vote of 220,700 to 28,634. 1998 *West Virginia Blue Book,* page 410.

■ It is axiomatic that our *Constitution* is a living document that must be viewed in light of modern realities. "Reasonable construction of our Constitution ... permits evolution and adjustment to changing conditions as well as to a varied set of facts.... The solution [to problems of constitutional interpretation] must be found in a study of the specific provision of the Constitution and the best method [under current conditions] to further advance the goals of the framers in adopting such a provision." *Randolph County Bd. of Educ. v. Adams*, 467 S.E.2d 150, 163, 196 W.Va. 9, 22 (1995) (holding that free textbooks are today required by the *West Virginia Constitution's* guarantee of a thorough and efficient education, even though they were not required when the *Constitution* was adopted).

Having carefully reviewed the specific provision of the *Constitution* at issue in the instant case, we must undertake an effort to identify "the best method to further advance the goals of the framers in adopting" that provision, if the State is to find a just and workable solution to the difficult constitutional quandary presented to us by the case *sub judice.* We shall look first at how those goals and purposes were expressed in the past, and then examine what must be done to give effective and practical expression to those goals and purposes in the present. We are striving to discern what, under modern conditions, fulfills the goal and purposes of the framers of the *Constitution* in creating the elective Office of Attorney General. In other words, we are striving to discern what are the inherent or "core" functions of the State's chief legal officer under modern conditions, the elimination of which would deprive the office of its ability to serve the goal and purposes for which it was created.

In 1872–73, when our *Constitution* was established, the self-evident "purpose" of having a constitutionally-established Attorney General was to give to one accountable, elected public official the responsibility for coordinating, understanding, and conducting the large majority of the State's legal business—including research, advice, and representation. As we have noted, the statutory expression of that purpose appears clearly from the first enactment of law on the subject by the Legislature after the *Constitution* was adopted and is likewise evident from virtually every subsequent enactment thereafter.

■ At the time of our *Constitution's* adoption, West Virginia had a small central government of limited responsibilities; a government that in almost every instance would hold and maintain a single perspective or position on legal issues. Under modern conditions, however, our State government is a behemoth organization, comprised of scores of agencies, officials, bureaus, authorities, commissions, councils, divisions, departments, agents, associations, and public corporations. Many of these entities are in numerous respects independent, but nevertheless have sufficient State authority, direction, assistance, or funding so as to make them "State" entities in some or all circumstances.[17]

In 1932, the Legislature amended and reenacted what is today *W.Va.Code*, 5–3–1 [1994], reiterating the responsibility of the Attorney General to provide legal counsel to and represent virtually *all* State entities in litigation—and, significantly, expressly prohibiting the expenditure of public funds for the provision of legal services to the State by any person other than the Attorney General,[18] a statute that remains on the books

---

17. "To determine if an entity is a State actor subject to constitutional duties or restrictions, the nature and extent of State involvement must be evaluated so as to determine if its actions are fairly attributable to the State." Syllabus Point 4, *West Virginia Trust Fund, Inc. v. Bailey*, 199 W.Va. 463, 485 S.E.2d 407 (1997).

18. *W.Va.Code*, 5–3–1 [1932], 1932 *Acts of the Legislature, Executive Session*, chapter 2, stated:
(2) The attorney general shall give his written opinion and advice upon questions of law, and shall prosecute and defend suits, actions, and other legal proceedings, and generally render and perform all other legal services, whenever required to do so, in writing, by the governor, the secretary of state, the auditor, the state superintendent of free schools, the treasurer, the commissioner of agriculture, the board of public works, the tax commissioner, the state archivist and historian, the commissioner of banking, the adjutant general, the chief of the department of mines, the superintendent of public safety, the board of control, the state

today. This statute vests in the Attorney General a wide-ranging responsibility to advise and represent virtually every State entity in litigation. It is notable that *W.Va.Code*, 5-3-1 [1994] couches the Attorney General's duties in terms of the Attorney General being "required" or "requested" to render legal services to the officers named therein. A companion statute, *W.Va.Code*, 5-3-2 [1987], expressly *requires* that the Attorney General *"shall appear"* for the State in all litigation in this Court or any federal court "in which the State is interested." Additional provisions of that statute require the Attorney General also to "defend" State officers, etc.[19]

road commission, the workmen's compensation commissioner, the public service commission, or any other state officer, board or commission, or the head of any state educational, correctional, penal or eleemosynary institution; and it shall be unlawful from and after the time this act becomes effective for any of the public officers, commissions, or other persons above mentioned to expend any public funds of the state of West Virginia for the purpose of paying any person, firm, or corporation for the performance of any legal services: Provided, however, that nothing contained in this act shall impair or affect any existing valid contracts of employment for the performance of legal services heretofore made.

(2) It shall also be also the duty of the attorney general to render to the president of the senate and/or the speaker of the house of delegates, a written opinion or advice, upon any questions submitted to him by them or either of them whenever he is requested in writing so to do.

(3) All acts or parts of acts in conflict with the foregoing acts, or any parts thereof, are hereby repealed.

In 1991 this statute was amended to replace the chief of the department of mines with the commissioner of the division of energy; to replace the board of control with the state commissioner of public institutions; and to replace the workmen's compensation commissioner with the commissioner of the bureau of employment programs. 1991 *Acts of the Legislature*, chapter 16. These were essentially technical amendments to reflect changes in governmental structure and nomenclature. In 1994 the statute was similarly amended to replace the commissioner of the division of energy with the director of the division of environmental protection, and to replace the state road commission with the commissioner of the division of highways. 1994 *Acts of the Legislature*, chapter 61.

19. *W.Va.Code*, 5-3-2 [1937] stated:
He [the attorney general] shall appear as counsel for the state in all causes pending in the supreme court of appeals, or in any federal court, in which the state is interested; he shall appear in any cause in which the state is interested that is pending in any other court in the state, on the written request of the governor, and when such appearance is entered he shall take charge of and have control of such cause; he shall defend all actions and proceedings against any state officer in his official capacity in any of the courts of this state or any of the federal courts, when the state is not interested in such cause against such officer, but should the state be interested against such officer, he shall appear for the state; he shall institute and prosecute all civil actions and proceedings in favor of or for the use of the state which may be necessary in the execution of the official duties of any state officer, board or commission on the written request of such officer, board or commission; he may consult with and advise the several prosecuting attorneys in matters relating to the official duties of their office, and may require a written report from them of the state and condition of the several causes, in which the state is a party, pending in the courts of their respective counties; he may require the several prosecuting attorneys to perform, within the respective counties in which they are elected, any of the legal duties required to be performed by the attorney general, which are not inconsistent with the duties of the prosecuting attorneys as the legal representatives of their respective counties; when the performance of any such duties by the prosecuting attorney conflicts with his duties as the legal representative of his county, or for any reason any prosecuting attorney is disqualified from performing such duties, the attorney general may require the prosecuting attorney of any other county to perform such duties, in any county other than that in which such prosecuting attorney is elected and for the performance of which duties outside of the county in which he is elected the prosecuting attorney shall be paid his actual traveling and other expenses out of the appropriation for contingent expenses for the department for which such services are rendered; he shall keep, in proper books, a register of all causes prosecuted or defended by him in behalf of the state or its officers and of the proceedings had in relation thereto, and deliver the same to his successor in office; he shall preserve in his office all his official opinions and publish the same in his biennial report.

In 1972 this statute was amended to authorize the attorney general under certain circumstances to assist in the prosecution of crimes committed by inmates of state correctional institutions, 1972 *Acts of the Legislature*, chapter 13; and in 1987 the statute was amended to authorize the attorney general to represent members of the national guard in certain circumstances, 1987 *Acts of the Legislature*, chapter 13.

Had these two statutes been scrupulously observed over the years, it is unlikely that the petition presently before this Court would ever have been filed. However, as the Attorney General's brief clearly demonstrates, the Legislature has chosen to *indirectly* amend these statutes by providing, in other enactments, express authority for various State entities to hire additional legal counsel not under the direction of the Attorney General.[20] As noted in this opinion, *see* n. 14, *supra*, at least a few of the statutory authorizations to State entities to hire and use lawyers other than those employed or approved by the Attorney General have a fairly long history to them.

One reason for the accumulation of statutes permitting the hiring and use of non-Attorney General lawyers is almost certainly the development of the large State government composed of diverse State entities, to which we earlier alluded. These State entities engage in a wide variety of activities and enterprises, often with little or no contact or coordination with one another. Complex and specialized legal issues are involved in nearly every entity's activity; many entities require intensive, day-to-day, professional legal expertise, judgment, advice, and representation. Moreover, in a not insubstantial number of cases, these diverse State entities have contrasting perspectives and interests, and may take different (even competing or conflicting) legal positions before tribunals— sometimes on important issues involving State rights and powers generally, citizen or business rights, etc.

Under these circumstances, the perceived need for specialized "in-house" legal expertise in certain fields is understandable. And in a government necessarily containing diverse entities, with diverse perspectives, there is an inherent tendency to seek to bring a particular entity's legal staff more under the direct employ and control of the State entity—to further the ends of loyalty and accountability to the State entity. This tendency, however, may not be permitted to undermine the basic constitutional scheme that establishes a chief State legal officer with central responsibility regarding the legal affairs of the State.

While providing legal counsel and services to a large and diverse range of State entities may be theoretically achievable under a system where the Attorney General's direct employees are the sole and exclusive legal representatives and counselors for every State entity in every situation, it cannot be said that such a system is the only feasible way to achieve this end. Moreover, we are not cited to any authority, from the collective jurisprudence of a nation where there are more than forty voter-elected, constitutional, state attorneys general, where a claim of complete and exclusive jurisdiction over all state legal matters by an attorney general has been upheld. Nor do the authorities, it should be noted, yield up any case that upholds a claim of unfettered Legislative discretion with respect to the role, powers, and duties of the constitutional Office of Attorney General.[21]

We do not doubt that the centralized provision of legal services to the State by a single elected public official was the intent of the establishment of the Office of the Attorney General in 1872–73—when our State government was less complex and greatly reduced in size, as compared to modern-day state government. However, to say this is only to state a tautology that, for purposes of our constitutional analysis in the instant case, leads nowhere. As in the case of the constitutional guarantee of education in *Randolph County Bd. of Educ.*, *supra*, to make our constitutional analysis in the instant case meaningful, we must identify the inherent, "core" functions of such centralization that

---

**20.** Some of these enactments, among them statutes that are referenced by the Attorney General's petition, acknowledge *W.Va.Code*, 5–3–2 directly or indirectly. Others contain no reconciliation language. Still others are not separate enactments, but simply appropriations for the personal services of lawyers.

**21.** The cases from other jurisdictions that are cited in this opinion are instructive; however, in general there is not an abundance of precedent on the issues, arising in the instant case, suggesting that the application of the principles of accommodation, respect, and comity among affected branches and officers of government have usually operated to resolve such issues without litigation.

are both vital and viable under modern conditions.

As we have discussed, one distinctive aspect of modern governmental conditions is the presence of multiple State entities with varying perspectives and interests. Under these conditions, if no central legal office is substantially involved with the legal affairs of a State entity, especially in litigation, legal decisions may be made by the entity (or by a tribunal) that may well have broad effects on the State and on other State entities generally—without any awareness or input from potentially affected State entities that have no knowledge of the decisions, litigation, or issues involved. Members of this Court have on more than one occasion expressed concern that non-involvement of the Attorney General in litigation involving State entities can lead to "harm and damage to the State." *State ex rel. Affiliated Construction Trades Council v. Vieweg,* 205 W.Va. 687, 700 n. 6, 520 S.E.2d 854, 867 n. 6 (1999) (Workman, J., concurring); *see also W.Va. Division of Environmental Protection v. Kingwood Coal Co.,* 200 W.Va. 734, 755 n. 1, 490 S.E.2d 823, 843 n. 1 (Starcher, J., dissenting).[22]

We believe that under modern conditions a necessary and vital function of the State's chief legal officer, the Attorney General, is to assure that a State entity's legal policy (and particularly its assertion of legal positions before tribunals) is formulated in consultation and coordination with the legal policy and positions of other State entities.

Of course (and this point cannot be overemphasized), each State entity is entitled to fully loyal, confidential, conscientious, and zealous legal counsel in developing, asserting, and defending its particular legal perspective.[23] But just as importantly, each State entity—and the State and her citizens generally—are, pursuant to the constitutional structure established by the framers, entitled to a governmental structure wherein a central legal office, along with providing day-to-day legal services to a wide range of State entities, can consider the issues in a given case in light of the broader interests of the State and in view of the impact on the full range of State entities. In our view, this is a core function of an Attorney General's office that is essential in modern times to achieve the constitutional purpose of the framers in 1872–73 when they established a single, elected chief legal officer for the State.

### D.

█ Based on all of the foregoing, we hold that the inherent constitutional functions of the Office of the Attorney General of the State of West Virginia include: (1) to play a central role in the provision of day-to-day professional legal services to State officials and entities in and associated with the executive branch of government;[24] (2) to play a central role in ensuring that the adoption and assertion of legal policy and positions by the State of West Virginia and State entities,

---

**22.** *See also* the Statement that Justices Albright and Starcher add with their votes on petitions for appeal from life imprisonment sentences, stating their view that this Court should accept and hear all life sentence appeals, in part because the participation of the Attorney General in such appeals would further the ends of justice. In general, we observe that the representation by the Attorney General's office on behalf of State entities (and the independent submissions of the Attorney General's Office when that office has been asked to make submissions by this Court) have consistently been of the highest professional caliber.

**23.** Where the duty to make policy and enforce the laws has been given to an executive agency, the Attorney General's "primary responsibility [in his role as legal counselor and representative] is to provide proper representation and competent counsel to the officer or agency on whose

behalf he appears." *Manchin v. Browning,* 170 W.Va. at 790, 296 S.E.2d at 920. "[T]he Attorney General's role in this capacity is not to make public policy in his own right on behalf of the State." *Id.*

**24.** As contemplated by *W.Va.Code,* 5–3–1– and – 2, and *Manchin v. Browning,* the Office of the Attorney General, upon request, provides representation in litigation to state officers, agencies and instrumentalities to advance the view of the law and facts of a case propounded by the state office, agency, or instrumentality involved. Where two or more such state entities assert differing or opposing views in the same litigation, and request representation by the Office of the Attorney General, that office has the option of providing assistant attorneys general to such entities or any of them, or authorizing special assistant attorneys general from the private sector bar for any or all such entities.

particularly before tribunals, is made only after meaningful consideration of the potential effects of such legal policy and positions on the full range of State entities and interests; (3) to assure that a constitutional officer who is directly elected by and accountable to the people may express his legal view on matters of State legal policy generally and particularly before tribunals where the State is a party.

Additionally, in light of long-established statutes, practice, and precedent recognizing that State executive branch and related entities may in some circumstances employ and use lawyers who are not employees of the Attorney General, we hold that such employment and use—and statutes, rules, and policies authorizing such employment and use—are not *per se* or facially unconstitutional.

This Court invites the executive branch entities involved in the instant case, the Legislature, and the Attorney General to commence a full review of the practices that have emerged over the years with regard to the use of in-house lawyers by various State entities (and the hiring of private counsel to represent the State interest in litigation, *see* footnote 25.) The policy enunciated by the Legislature in *W.Va.Code*, 5–3–1 and 2, addresses the public interest in (1) assuring a consistent "legal policy" for the State; (2) avoiding the undue expenditure of public funds for legal counsel outside the Office of the Attorney General; and (3) recognizing the decision of the people of this State to have, in theory and in fact, an elected chief legal officer of the State, answerable to them at the polls. It is appropriate for the Legislature to undertake a review of its various enactments that may present unresolved con-

flict with the long-standing expressions of constitutional purpose and public policy that are reflected in *W.Va.Code*, 5–3–1, *et seq.*, in order to, in the words of the Preamble to our *Constitution*, "seek diligently to promote, preserve and perpetuate good government" for our State.

More often than not, the various occupants of the Office of Attorney General have been, upon request, most cooperative with various executive agencies who have advanced the need for in-house counsel or, on a particular occasion, for representation in litigation by a lawyer or lawyers outside the Office of the Attorney General, either by the usual or occasional use of "in-house" counsel or, on special occasions, private counsel.[25] Moreover, we have recognized that, on occasion, the Attorney General may be unable to appear in litigation because of a conflict, or may be required to allow representation of a State agency by private counsel or by assistants between whom a wall of client confidentiality must be erected. Nevertheless, we also recognize that Attorneys General have historically performed their clear constitutional duty to respond fully and adequately when requested by State entities to provide legal advice and representation, and have the clear responsibility to continue doing so.

The principles of comity and mutual respect should govern the day-to-day operation of these relationships. It is inherent in the principles of a constitutionally divided executive and in the separation of powers that respectful cooperation and coordination are expected within the divided executive and between the executive and legislative branches, in the absence of the absolute necessity for confrontation. In that vein, this Court should not be asked to serve as—and conse-

---

**25.** At this juncture, we make brief mention of the issue of the use by State entities of lawyers who are not state employees, *see* note 3 *supra*, including the hiring of private law firms to represent such entities in litigation, sometimes at substantial fees. The scope and propriety of such practice was not fully developed or addressed in the instant case, but the general principles enunciated herein are applicable to the employment of private lawyers by State entities, both for consultation and particularly for representation before tribunals. Specifically, to the extent that such a practice conflicts with the provisions of *W.Va.*

*Code*, 5–3–2, which discourages that practice without the consent of the Attorney General, or operates to prevent the Attorney General from fulfilling his constitutional role as the State's chief legal officer, as discussed herein, it is arguably statutorily and constitutionally offensive. Our invitation herein to the Legislature and Executive to address the specifics of our governmental structure for the provision of legal services to State entities therefore extends to the issue of the employment of private lawyers by State entities.

quently we seek to avoid being—a referee of the relations among constitutional equals.[26]

 Having said that, we are nevertheless of the opinion that care must be taken to accord to the Attorney General the full opportunity to perform his constitutional and statutory duties. We therefore hold that to ensure that the Office of the Attorney General can perform its inherent constitutional functions, the Legislature has the implicit obligation to provide sufficient funding to the office. Additionally, no statute, policy, rule, or practice may constitutionally operate, alone or cumulatively, to limit, reduce, transfer, or reassign the duties and powers of the Office of the Attorney General in such a fashion as to prevent that office from performing its inherent constitutional functions.

 To implement the foregoing, we further hold that in all instances when an executive branch or related State entity is represented by counsel before a tribunal, the Attorney General shall appear upon the pleadings as an attorney of record; however, this requirement does not bar other counsel from also appearing and acting in a legal capacity for the State entity. The Attorney General additionally has the right to appear as an intervenor as Attorney General on behalf of the State in all proceedings where the interest of the State or a State entity is at issue, to assert the Attorney General's view of the law on behalf of the State.[27] To maintain a proper constitutional balance, however, this right must always be exercised with restraint and due respect by the State entity and the Attorney General.

## IV.

### Conclusion

We have a limited record[28] before us, and for that reason, we decline to give any consideration to the specific attorney positions and statutes that are identified in the Attorney General's petition—with regard to their effects, separately or cumulatively, on the ability of the Office of the Attorney General to perform its constitutional role.

Moreover, we are firmly convinced that with the foregoing principles having been articulated, the parties in the instant case now have both the tools and the duty to work together to address and resolve specific issues, using principles of accommodation, respect, and comity. We therefore deny the specific relief requested by the Attorney General, but we grant the writ as moulded by requiring the petitioner and the party respondents to be guided by the holdings set forth in this opinion.[29] If non-judicial resolution of any specific issues that arise cannot

**26.** "[U]nder the doctrine of least obtrusive [intrusive] remedy, this Court will not strike down otherwise constitutional legislation when there is an adequate remedy to prevent such legislation from being unconstitutionally applied." *Starcher v. Crabtree*, 176 W.Va. 707, 709, 348 S.E.2d 293, 295 (1986) (McGraw, J., dissenting, citations omitted) (contending that statute creating family law masters could be applied in a fashion that did not violate the *Constitution* ).

**27.** The Attorney General's appearance on the pleadings necessarily implies his opportunity to consult with the State entity, consistent with applicable rules of confidentiality and professional responsibility, regarding the matters at issue before the tribunal. Leaving aside the exceptional situation, an entity taking or responding to legal action before a tribunal would ordinarily turn to the Attorney General to ascertain whether that office can and will represent the entity. As discussed *supra*, when the Attorney General is providing actual legal representation to a State entity, he or she is required under *Manchin* to represent the entity's position, and to provide a lawyer that the Attorney General in his discretion selects to perform such representation. In the

event that the Attorney General takes a different view of matters before a tribunal than the State entity, the Attorney General's intervenor standing permits the presentation of the Attorney General's view. In the event that such situation arises, it is incumbent upon all parties to exercise their respective duties in such a manner as to respect the *Rules of Professional Conduct* and promote the effective disposition of legal proceedings.

**28.** For example, we have no factual record regarding the attorney positions in question. Additionally, as noted *supra* at note 12, the large majority of our nation's states have elected Attorneys General. We do not have any record upon which any comparison could be made between the current situation in West Virginia and in these other jurisdictions—a comparison that could shed further light on the issues raised in the Attorney General's petition.

**29.** Except that we do note, given the Attorney General's statements in his reply brief, that the Public Service Commission lawyers and the administrative law judges identified in the petition are not subject to the Attorney General's claims.

be achieved using the principles of accommo-
dation, respect, and comity, the parties may
seek further resolution again in court.

Writ Granted as Moulded.

## APPENDIX
Executive Agencies Who Directly Employ Staff Attorneys Without the Consent
of the Attorney General (Amended) [1]
(Exhibit 1 to Petition for Mandamus)

| Agency | Number of Attorneys | Total Annual Salary | Purported Statutory Authorization |
|---|---|---|---|
| Administration | 2 | $ 128,008 | W.Va.Code 5A–1–3 |
| Auditor | 2 | $ 117,756 | 12–4–8a |
| Banking | | $ 114,852 | 31A–2–5(b) (2002) |
| Child Support Enforcement | 28 | $ 1,224,099 | 48A–2–14 |
| Concord College | 1 | $ 61,000 | 18B–1–8, 18B–2A–4 |
| Consolidated Public Retirement System (retained by contract) | 1 | $ 74,880 (Maximum annual compensation.) | 5–10D–2(d) |
| Corrections | 1 | $ 49,836 | |
| Dentists and Hygienists, Board of | 2 | $ 60,000 | |
| Development Office | 1 | $ 72,000 | 31–15–5, 31–15–6 |
| Education, Department of | 3 | $ 161,250 | |
| Employment Programs (29 Employed as ALJs, 24 as Staff Lawyers) | 53 | $ 2,662,113 | 21A–2–6, 21A–2–18, 21A–7–20, 23–1–1 |
| Environmental Protection, Division of | 13 | $ 723,344 | 22–1–6 |
| Environmental Quality Boards (Employed as Advisor/Adminis-trator) | 1 | $ 44,723 | |
| Ethics Commission | 1 | $ 66,256 | 6B–2–2 |
| Health and Human Resources (excluding Child Support Enforcement) | 13 | $ 621,280 | 9–7–1, 16–5C–14, 16–5D–14, 16–5H–14, 16–5N–14 |
| Health Care Authority | 2 | $ 138,132 | 16–29B–7 |
| Higher Ed | 1 | $ 100,092 | 18B–1B–4 |
| Highways | 17 | $ 926,120 | 17–2A–7 |
| Housing Development Fund | 1 | $ 75,504 | |
| Insurance Commissioner | 5 | $ 223,461 | 33–2–3, 33–2–17 |
| Labor, Division of | 1 | $ 57,732 | |
| License Practical Nurses, Board of (Employed as Advisor/Admin-istrator) | 1 | $ 53,911 | |
| Lottery Commission | 2 | $ 75,940 | |
| Marshall University | 1 | $ 110,000 | 18B–1–8, 18B–2A–4 |

1. This table is a compilation of the listed agen-cies' individual responses to FOIA requests as of August, 2000, supplemented with updated infor-mation from the Auditor's response to a FOIA request for information derived from the Payroll Information System, as of July, 2001. Because the Auditor's response could not be as complete as the original agency responses, some changes occurring since August, 2000, may not be proper-ly reflected herein. After submission of this case to the Court, the table was amended to reflect newly enacted statutes authorizing the commis-sioners of Banking and Tax to hire in-house counsel or to retain outside counsel without the consent of the Attorney General. It has further been amended to incorporate counsel retained by the Consolidated Public Retirement Board, on contract, as indicated in the Board's Brief.

| | | | |
|---|---|---|---|
| Medicine, Board of | 2 | $ 85,544 | 30–3–7 |
| Military Affairs and Public Safety, Department of | 1 | $ 56,512 | |
| Motor Vehicles | 2 | $ 113,616 | |
| Pharmacy, Board of (Employed as Advisor/Administrator) | 1 | $ 57,543 | |
| Public Employees Insurance Agency | 1 | $ 61,092 | |
| Public Service Commission (8 employed as ALJs, 22 as staff attorneys) | 30 | $ 1,779,708 | 24–1–8 |
| Regional Jail and Correctional Facility Authority | 1 | $ 60,756 | |
| Shepherd College | 1 | $ 71,602 | 18B–1–8, 18B–2A–4 |
| State Tax Division | 12 | $ 568,800 | 11–1–1a (2002) |
| Tax and Revenue, Department of | 1 | $ 80,004 | |
| Treasurer | 2 | $ 120,084 | 12–4–8a |
| WV Northern Community College | 1 | $ 61,920 | 18B–1–8, 18–2A–4 |
| WV School of Osteopathic Medicine | 1 | $ 64,896 | 18B–1–8, 18B–2A–4 |
| WV State Police | 1 | $ 45,720 | |
| WVU | 5 | $ 364,260 | 18B–1–8, 18B–2A–4 |
| TOTAL: | 217 | $11,534,347 | |
| TOTAL WITHOUT ALJs | 180 | $ 9,439,918 | |

### ATTORNEYS EMPLOYED BY THE ATTORNEY GENERAL

| | | | |
|---|---|---|---|
| Attorney General's Office | 65 | $ 3,507,879 | W.Va.Code 5–3–1 and 5–3–2, etc. |

ALBRIGHT, Justice, concurring.

(Filed June 11, 2002)

I concur fully in the excellent unanimous opinion of this Court authored by Justice Starcher. The opinion, in my judgment, is soundly grounded in constitutional history and precedent. It represents a superb effort to reach a balanced judgment on difficult issues that profoundly affect the relationship among all three branches of our state government generally, and the somewhat more obscure issues posed by the decision of the framers of our state constitution to apportion the executive power of the government among several constitutional officers.

While I do not anticipate that the judgment of this Court in this case will meet with universal approval, I earnestly hope that it merits and is accorded universal respect. This case came to us with the makings of a constitutional crisis. The opinion we have rendered represents, among other things, a constitutional framework upon which the Legislature and the multi-faceted Executive can, with earnest efforts and appropriate levels of comity, build a mutually satisfactory and mutually respectful means of dealing with the problems presented, to a greater or lesser extent, in the pleadings, briefs and arguments. Our decision also represents, as the Court's opinion notes, a profound effort to fashion the least intrusive remedy, a result of the perceived intention of this Court to accord proper respect to both of the other branches of our state government.

I write separately primarily to underline the invitation to the parties, issued clearly by the Court's opinion, to bring about a reasoned resolution of the matters raised in the case which appear, at least facially, to be of less than constitutional magnitude. One pro-

vision of our state's law, which was vividly brought to our attention by this case, is the language found in West Virginia Code § 5–3–1 (1994), which reads as follows:

> [I]t is unlawful from and after the time this section becomes effective for any of the public officers, commissions, or other persons above mentioned to expend any public funds of the state of West Virginia for the purpose of paying any person, firm or corporation for the performance of any legal services.

That statutory provision was adopted in the heart of the Great Depression. It expresses a policy of the Legislature which, as the current case demonstrates, has been varied by some subsequent enactments of law and, apparently, by the simple exercise of legislative or executive fiat. Nevertheless, that provision enunciates a public policy which is protective of the fiscal affairs of this state and expressive of a proper concern for the unnecessary expenditure of public funds for legal services-services which may in some instances be more properly and more efficiently provided by the office of the attorney general.

The reality is that the opinion rendered by the Court in this case is not about the particular persons who may, for the moment, occupy specific offices or have responsibility for the operation of various state entities. The issues involved in such a review of this long-standing public policy affect the future of the state and its government, regardless of who may now or hereafter hold public office or control various entities of state government.

In my view, such issues are subject to being properly and more appropriately resolved by the legislative and executive branches working together, all parties being sensitive to each others' constitutional prerogatives and statutory obligations. The effort by this Court to encourage all concerned parties to undertake a review of this public policy in light of the subsequent growth and modern complexity of state government deserves the prompt and thorough attention of all affected parties-hopefully in a spirit of cooperation and mutual respect.

The oft-heard call for judicial restraint has clearly been heeded here. Indeed, the Court's opinion is both a call for the parties to amicably resolve these issues outside the judicial system and a declaration of confidence that our counterparts in the legislative and executive branches will do so-for the long-term good of the state.

KAUFMAN, sitting by temporary assignment, concurring.

(Filed June 21, 2002)

I concur with the Court's opinion and recognize the arduous task that was set before the Court with this case. Specifically, I fully concur with the Court's finding that the Attorney General is the chief legal counsel for the state. The Court's opinion strove to balance the everyday workings of governmental entities, the framework of our constitution and current legislation. The Court wanted to strike a balance between all parties and create an atmosphere where the parties could resolve any remaining issues outside the judicial forum.

However, in striking a fair balance, I feel three unresolved issues remain: the constitutionality of governmental entities hiring outside counsel despite the clear Legislative language set forth in West Virginia Code § 5–3–1 (1994); the lack of disclosure and accountability of outside attorneys representing the state's interest; and the erosion of the Attorney General's role as chief legal officer as a result of the cumulative effect of all the statutes that allow executive agencies to independently hire outside counsel.